SCSC CORP., formerly known as Schloff Chemical and Supply Company, Petitioner, Respondent,

v.

ALLIED MUTUAL INSURANCE COMPANY, as Successor in Interest to AID Insurance Company, Tower Insurance Company, Petitioners, Appellants.

Nos. C2–93–1408, C8–93–1414 and C3–93–1630.

Supreme Court of Minnesota.

Aug. 18, 1995.

Clarification Denied Sept. 7, 1995.

Sean E. Hade, Mary P. Rowe, Jardine, Logan & O'Brien, St. Paul, for Tower Ins. Co.

Dale O. Thornsjo, Eric J. Strobel, Peters & Hektner, Ltd., Minneapolis, for Allied Mut. Ins. Co.

Thomas C. Mielenhausen, James A. Mennell, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for respondent.

Stephen Shakman, Adonis A. Neblett, Asst. Attys. Gen., St. Paul, for amicus curiae State of MN.

Charles E. Lundberg, Bassford, Lockhart, Truesdell & Briggs, P.A., Minneapolis, for amicus curiae Ins. Env. Litigation Assoc.

---

## ORDER

Based upon the files, records and proceedings herein,

IT IS HEREBY ORDERED that the motion for clarification filed in the above-entitled matter be, and the same is, granted for the limited purpose of issuing the attached amended opinion and that the petition for rehearing filed in the above entitled matter be, and the same is, denied.

IT IS FURTHER ORDERED that the motion to remand for a hearing on post-July 1, 1993 damages, interest, fees and disbursements filed in the above-entitled matter be, and the same is, denied.

BY THE COURT:
/s/ Alexander M. Keith
Chief Justice

ANDERSON, J., took no part in the consideration or decision of this case.

Heard, considered and decided by the court en banc.

## OPINION

KEITH, Chief Justice.

In October 1990, SCSC Corp., formerly known as Schloff Chemical and Supply Company, commenced this action against its liability insurance carriers, Allied Mutual Insurance Company and Tower Insurance Company. SCSC sought a determination of the insurers' obligations under liability insurance policies for costs SCSC incurred as the result of soil and groundwater contamination. Following trial, the jury returned a verdict in favor of SCSC. In its Amended Findings of Fact, Conclusions of Law and Order for Judgment [hereinafter "amended order"], the trial court ordered a total judgment of $996,-017.90 against Allied. This included $100,000 in remediation costs, enhanced reasonable attorney fees based on a 1.5 multiplier, and additional costs, disbursements and interest. The trial court also ordered judgment against Tower for remediation costs of $386,-294.41. The Minnesota Court of Appeals affirmed in all respects except the enhanced portion of the attorney fees award. We affirm in part, reverse in part and remand.

### I.

From 1976 to the end of 1988, SCSC operated a dry cleaning and laundry supply distribution facility in St. Louis Park, Minnesota. As a small portion of its business, SCSC purchased, stored, repackaged and distributed perchloroethylene (PCE or "perc"), a chemical used by retailers to dryclean clothes. The Minnesota Pollution Control Agency ("MPCA") has identified perc as a volatile organic compound. SCSC stored perc in two above-ground storage tanks. Outgoing perc was dispensed through a fill pipe at the southwest corner of SCSC's building into independent contract delivery trucks, which delivered the perc to SCSC customers. To fill a delivery truck with perc,

the truck driver connected a hose from the truck's tank to the fill pipe. The driver was responsible for placing a five gallon bucket under the fill pipe to capture any perc that dripped when the fill pipe and the hose were uncoupled.

During much of the time SCSC was in business, it purchased from Allied and Tower the following comprehensive general liability policies and excess liability policies, each of which were in effect for a period of one year:

| Insurer | Cumulative Period of Coverage | Type of Coverage | Property Damage Liability Limits |
|---|---|---|---|
| Allied | 10/10/75–10/10/84 | Comprehensive General Liability (CGL) Coverage | $100,000 per occurrence/ $100,000 in the aggregate |
| Tower | 4/2/77–10/10/82 | Excess Liability (Umbrella) Coverage | $1,000,000 per occurrence/ $1,000,000 in the aggregate $10,000 retained limit |
| Allied | 10/10/82–10/10/84 | Excess Liability (Umbrella) Coverage | $1,000,000 per occurrence/ $1,000,000 in the aggregate $10,000 retained limit |

In October 1988, the MPCA contacted SCSC in regard to a detection of perc in the groundwater downgradient of the SCSC facility. Because SCSC was the only perc handler in the immediate area, the MPCA issued a Request for Information ("RFI"), instructing SCSC to provide information regarding chemical storage and potential chemical leaks at the facility. In his November 16, 1988 response to the MPCA's RFI, SCSC's general manager, Dennis Zimmer, indicated that SCSC stored perc waste at the facility and that "[d]rippings have occurred at the southwest corner of the building during filling of tanks. Attaching couplings and hoses during the fill process have caused drips * * *." Further, SCSC indicated that the "[v]olume [is] unknown—since drips have occurred for a period of years in small volume." In December 1988, in response to the MPCA's action, SCSC retained the services of Delta Environmental Consultants, Inc.

From December 1988 to January 1990, the MPCA required SCSC to develop several remedial work plans to investigate and to respond to the perc contamination detected in the aquifer under the SCSC facility. SCSC was required to pay for these measures, which included the installation of at least twenty monitoring wells and of a "pump and treat" system to decontaminate the groundwater. In response to these measures, in October 1989, SCSC contacted Allied and Tower and requested reimbursement for past costs and payment of future costs. associated with the perc cleanup. Although the parties dispute whether SCSC provided the insurers with sufficient information to invoke coverage and hence, the duty to defend, it is undisputed that SCSC sent both Allied and Tower letters dated October 6, 1989, notifying the insurers of the MPCA actions and requesting indemnification.

Following this notice, SCSC and Allied exchanged a series of letters and information. Despite SCSC's explicit requests, and despite Allied's indication to SCSC that it was conducting an investigation, Allied did not take a coverage position. Allied now asserts that this refusal was grounded on its belief that "no 'allegations' were referenced nor facts presented which claimed that property damage existed during Allied's policies, that there was an occurrence under the policies, or that such alleged occurrence was a cause of the remediation costs at issue." On March 27, 1990, the MPCA issued a Request for Response Action ("RFRA") that required SCSC to take specific action to remediate the site. The RFRA indicated that SCSC's failure to comply would permit the MPCA either to undertake the response action and seek reimbursement from SCSC for all costs of such action, to initiate an action to compel

performance or to enjoin a release or a threatened release of hazardous substances from the site. In either case, the MPCA could seek a civil penalty of up to $20,000 per day for each day SCSC failed to take the requested action.

In October 1990, after incurring significant costs in responding to the MPCA's RFI and RFRA, SCSC commenced an action in Hennepin County District Court against Allied and Tower seeking declaratory and compensatory relief. SCSC sought a determination of the insurers' obligations under the liability insurance policies each insurer issued to SCSC. Following discovery, but prior to trial, SCSC, Allied and Tower each moved for summary judgment. On August 17, 1992, the district court denied summary judgment on all issues relevant to this appeal.

While trial was pending, SCSC continued to pay its environmental consulting firm for the remediation costs. By May 1991, however, SCSC was no longer able to pay these costs. At that time, the MPCA moved to allocate state funds for the remediation. By June 1991, the MPCA contracted with outside companies to operate the treatment system and to conduct additional investigations. At the time of trial, the MPCA sought reimbursement for nearly $186,000 in costs it had incurred. An MPCA hydrogeologist estimated that the total past and future costs to the MPCA would be just over $1 million.

At trial, SCSC's hydrogeologist, Keith Rapp, testified that the concentration pattern of perc in the groundwater under and downgradient of the SCSC site was not consistent with a routine, continuous spilling or "drippage." Rapp testified that, instead, the contamination profile suggested one or two times when perc entered the soil in high concentrations. Rapp's testimony was consistent with the testimony of SCSC employees and drivers who indicated that the perc drippings noted by Zimmer on the RFI response likely were not the cause of the contamination because such drippings were regularly caught in five gallon buckets placed under the fill pipe during delivery.

On April 2, 1993, following a 16–day trial, the jury returned a verdict in favor of SCSC. Based on testimony that a significant spill occurred in August 1977, the jury concluded on the special verdict form that property damage arose in August 1977, as the result of an unintended, unexpected, sudden and accidental event, and that the damage was neither divisible nor attributable to an overriding cause. Further, the jury found that the reasonable cleanup costs to date were $486,294.41 and that the reasonable future cleanup costs would be $840,000.00. Pursuant to this verdict, the district court issued Findings of Fact, Conclusions of Law and an Order for Judgment against Allied and Tower on April 12, 1993.

All parties made post-trial motions, and on July 1, 1993, the trial court issued an amended order, reaffirming the jury's findings and concluding that every Allied and Tower policy in effect during and after August 1977 was triggered "vertically" with respect to both indemnification and the duty to defend. Further, the court ordered a total judgment of $996,017.90 against Allied. This included $100,000 in remediation costs, reasonable attorney fees including a 1.5 multiplier, and additional costs, disbursements and interest through April 12, 1993. The court also ordered judgment against Tower for remediation costs of $386,294.41.

Allied and Tower appealed to the court of appeals, which affirmed in all respects except the enhanced portion of the attorney fees award. *SCSC Corp. v. Allied Mut. Ins. Co.*, 515 N.W.2d 588 (Minn.App.1994), *pet. for rev. granted* (Minn., June 29, 1994).

II.

Allied first argues that the trial court erred in denying Allied's motion for summary judgment because the facts alleged by SCSC were insufficient to establish a genuine issue of material fact. Specifically, Allied asserts that SCSC failed to prove: (1) property damage prior to 1981 or an actual injury during the policy periods; (2) policy coverage by Allied at that time; and (3) an occurrence in the form of an accident or a continuous and repeated exposure to conditions. Although Allied acknowledged that SCSC did submit affidavits in opposition to summary judgment, Allied argues that these state-

ments were too speculative and too ambiguous to create a genuine fact issue.

Prior to the summary judgment hearing, SCSC submitted several affidavits and considerable documentary evidence. As evidence of property damage, SCSC submitted the affidavit of Keith Rapp, a hydrogeologist with Delta Environmental Consultants, Inc. Based on his observations from participating in the SCSC site investigation and cleanup, Rapp opined that the groundwater under SCSC had been contaminated with perc some time prior to April 1981. SCSC also submitted an affidavit of Irving Schloff, the owner and president of SCSC, stating that the company was required to pay for investigation and remediation costs associated with the MPCA's detection of perc contamination under the site. Further, as evidence of an occurrence covered under the policies, SCSC submitted an affidavit of Richard Anderson, a former SCSC bookkeeper. In that affidavit, Anderson stated that an accidental spill of at least five gallons of perc occurred some time after 1976 but before 1982 and involved a SCSC truck driver named Frank Marconi. Finally, as evidence of policy coverage, SCSC provided various documents relating to primary coverage for the period 1976–1984 and relating to umbrella coverage for the period 1982–1984.

Although Allied argues that the affidavits were too speculative to create a genuine issue of material fact, each affidavit recited specific facts based on the personal knowledge of the affiant. Even if Allied's concerns regarding conflicts between Richard Anderson's affidavit and his earlier deposition statement are warranted, conflicts in testimony are matters for the jury in determining the weight and the credibility to be given to the testimony. *Grant v. Malkerson Sales, Inc.*, 259 Minn. 419, 422, 108 N.W.2d 347, 350 (1961).

We conclude that the trial court did not err in denying Allied summary judgment.

### III.

Allied also presents three issues with respect to SCSC's burden of proof at trial: (1) whether SCSC met its initial burden of proof to establish its prima facie case of coverage under the policies; (2) which party bears the burden of proof to show an exception to the policies' qualified pollution exclusion clause; and (3) which party bears the burden of proof to show whether damages were the result of an overriding cause.

Allied first argues that SCSC did not meet its initial burden of proof to establish its prima facie case of coverage. Specifically, Allied contends that, although the primary policy language required SCSC to show two separate causal links, the trial court presumed one of these links. As a result, Allied asserts that the court relieved SCSC of its burden to establish a necessary element of its prima facie case for coverage. We disagree.

■ In an action to determine coverage, the initial burden of proof is on the insured to establish a prima facie case of coverage. *Boedigheimer v. Taylor*, 287 Minn. 323, 329, 178 N.W.2d 610, 614 (1970). What constitutes a prima facie showing of coverage depends on the language of the particular policy. The policy must be read as a whole, and unambiguous language must be accorded its plain and ordinary meaning. *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 652 (Minn.1986).

■ Pursuant to its primary policies with SCSC, Allied agreed to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of * * * property damage to which this insurance applies, caused by an occurrence * * *."[1] Therefore, the first causal

1. Under its excess liability policies with SCSC, Allied agreed

[T]o indemnify the insured against such ultimate net loss in excess of the insured's primary limit as the insured sustains by reason of liability, imposed upon the insured by law or assumed by the insured under contract, for damages because of personal injury or property

damage to which this policy applies, caused by an occurrence anywhere in the world.

"Ultimate net loss" is defined in the policies as "the total sum which the insured, or any company as his insurer, or both, become obligated to pay as damages * * * because of personal injury or property damage, either through adjudication

link of the policies required SCSC, as the insured, to establish that it suffered "damages because of * * * property damage." This language requires the insurer to pay all damages causally related to an item of property damage under the policy definitions. *Federated Mut. Ins. Co. v. Concrete Units, Inc.*, 363 N.W.2d 751, 757 (Minn.1985), *reh'g denied* (Minn., March 29, 1985). The second causal link of the policies required SCSC, as the insured, to establish that the property damage was "caused by an occurrence." Under the terms of the policies, an "occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured * * *."

With respect to causation, the trial court instructed the jury in part:

Under each policy, Allied and Tower agreed to pay all sums which Schloff Chemical became obligated to pay because of property damage to which the policies—policy applies[,] caused by an occurrence.

\* \* \* \* \* \*

In order to trigger insurance coverage, Schloff Chemical must have shown by the greater weight of the evidence that an *event or events happened at the Schloff Chemical site which directly caused property damage* during the periods covered by Tower's and Allied's insurance policies. Subject to the terms, conditions, and limitations of the insurance policies, *contamination of an aquifer is a type of property damage* possibly covered under the policies issued by Allied and Tower to Schloff Chemical.

You will determine if or when property damage happened at the Schloff Chemical site. If you determine that property damage has arisen, *you must also determine whether the property damage resulted from a—an event or events at Schloff Chemical*—at the Schloff Chemical site.

A direct cause is a cause which has a substantial part in bringing about the property damage, either immediately or through happenings which follow one after

or compromise with the written consent of the

another. If two or more events cause property damage, each event may be considered a direct cause of the contamination.

\* \* \* \* \* \*

*You must determine the total costs or expenses paid or owed or payable in the future by Schloff Chemical as a result of property damage* regardless of your answers to the other questions on the verdict form. Included in your total should be all costs and expenses reasonably necessary to clean up the aquifer contamination.

Determination of damages must not be based upon speculation or guess. *Schloff Chemical must show by the greater weight of the evidence that the nature and amount of the costs are reasonably related to the aquifer cleanup.* Costs and expenses are reasonably related if they are or will be incurred or owed as costs involved in the cleanup of the aquifer or those actions taken to prevent, minimize, or eliminate the release of perc in order to protect the public health, welfare, or environment of the State of Minnesota.

(emphasis added). The corresponding questions on the Special Verdict Form and the jury's answers follow:

7. Was property damage arising prior to 10/10/84 caused by a sudden and accidental event or events?

YES     X

NO    ——————

\* \* \* \* \* \*

14. What is the total amount of reasonable costs and expenses incurred to date associated with the cleanup of the aquifer at the Schloff Chemical site?

Answer: $486,294.41

15. What is the total amount of costs and expenses which will be reasonable [sic] certain to arise in the future associated with the cleanup of the aquifer at the Schloff Chemical site?

Answer: $840,000

Allied argues that these instructions presumed the existence of the "damages"/"prop-

Company."

*Hill v. Okay Constr. Co., Inc.*, 312 Minn. 324, 346, 252 N.W.2d 107, 121 (1977) (citing *Sorenson v. Safety Flate, Inc.*, 306 Minn. 300, 235 N.W.2d 848 (1975)).

■ In the present case, the MPCA contacted SCSC by letter, dated October 26, 1988, informing it of the discovered groundwater contamination and requesting SCSC to complete an RFI. SCSC fully cooperated with the MPCA and hired an engineering firm to assist in its investigation and remediation responsibilities. However, SCSC did not inform Allied of the MPCA's actions until October 6, 1989, when it formally requested in a letter to Allied "that Allied indemnify [SCSC] for the liabilities [SCSC has] incurred and will incur in connection with the MPCA's property damage claims, including all sums associated with the investigation, defense and resolution of these claims." Although we have concluded that Allied had a duty to defend SCSC from the time the MPCA issued the RFI, SCSC did not invoke this duty until it properly tendered its defense request in the October 6, 1989 letter. We therefore reverse the award of attorney fees that SCSC incurred prior to October 6, 1989 and remand to the district court with directions to determine what portion, if any, of the trial court's award of attorney fees were incurred prior to October 6, 1989.

## V.

Appellant Tower Insurance Company presents two issues with respect to the trial court's allocation of the damage award. First, Tower argues that the trial court erred because the special verdict form it submitted to the jury asked the jury to state only the "date" upon which property damage arose. Tower is apparently concerned that the jury was not given the opportunity to account for any post–1977 spills in its damage allocation. Second, Tower argues that the trial court should have allocated the damages by using a "pro rata by time on the risk" allocation method, and should have allocated damages to SCSC for uninsured years.

Tower first argues the trial court should have given the jury the opportunity to state multiple dates upon which property damage arose. The special verdict form asked the

jury to state the singular date upon which property damage arose. The form also asked the jury to state whether the damage was divisible among any of the policy or post-policy years. Based on these questions, the jury found that property damage arose at the SCSC site in 1977 and that the damages were not divisible for any of the policy or post-policy dates. The trial court held that the special verdict form was the proper form because any prejudice to Tower resulting from the single date question was cured by allowing the jury to state whether the damages were divisible. The court of appeals agreed. 515 N.W.2d at 597. We also agree.

■ Generally, the trial judge has broad discretion regarding the form and substance of special verdict questions. *Gravley v. Sea Gull Marine, Inc.*, 269 N.W.2d 896, 900 (Minn.1978). In this case, the trial court gave the jury the opportunity to divide the property damage among the applicable policy periods. The jury found that the damages were not divisible. Moreover, as the court of appeals noted, there is no evidence in the record to indicate that any later, post-policy additions of perc to the groundwater increased cleanup costs. 515 N.W.2d at 597. On these facts, we cannot conclude that the trial court's special verdict form prejudiced Tower.

■ Tower also argues that the trial court's policy triggering and damage allocation schemes were erroneous. The trial court chose to trigger the policies "vertically," by year, beginning with the policies in effect in 1977. Allied's 1977 $100,000 limit was triggered first, and once that was exhausted, Tower's 1977 $1,000,000 excess policy was triggered. This is what is known as a "vertical trigger" scheme.

Tower argues that this court should adopt the "pro rata by time on the risk" theory of allocation first used by this court in *Northern States Power Co. v. Fidelity & Casualty Co. of N.Y.*, 523 N.W.2d 657, 663–64 (Minn.1994) [hereinafter "*NSP*"]. According to Tower, this would involve allocating proportional damages to Allied for all the years its primary policies were on the risk. Under this scheme, Tower's excess policies would be

triggered proportionally, for the years it was on the risk, only after Allied's primary policy limit of $100,000 per year is exhausted for all apportioned policy years. This would be a "horizontal trigger" of the primary and excess policies.

The issue before us in *NSP* was how to allocate damages consistent with the actual injury rule in an environmental contamination case in which property damage had occurred undetected over a long period of time and in which multiple insurance companies were on the risk in varying years. We opted, under the facts of *NSP*, to allocate damages pro rata by each insurer's "time on the risk." 523 N.W.2d at 662. Under this trigger method, each insurer is proportionally liable only for the damages that occur in the policy years in which the insurer was on the risk. For example, if property damage occurs continuously for 10 years, 1/10 of the damage would be allocable to a policy that was on the risk for one year, and 3/10 of the damages would be allocable to a policy that was on the risk for 3 years. *Id.* at 664. The advantage of this method was that it reduced the costs of litigation because it was a per se rule. We noted that this method "assumes that the damages in a contamination case are evenly distributed (or continuous) through each policy period from the first point at which damages occurred to the time of discovery, cleanup or whenever the last triggered policy period ended." *Id.* at 663. Although in *NSP* we adopted a "pro rata by time on the risk" trigger method for continuous groundwater contamination cases, we also noted that trial courts must be given flexibility in apportioning damages "in a manner befitting each case." 523 N.W.2d at 663.

Under the facts of the present case, we reject the multiple-year vertical triggering approach taken by the trial court. We also decline Tower's invitation to apply *NSP*'s pro rata by time on the risk triggering approach. In *NSP*, the damages occurred over multiple policy periods, and without evidence to the contrary, we concluded that such damages must be assumed to be continuous. Our decision in *NSP* was an equitable decision based upon the complexity of proving in which policy periods covered property damage arose. In the present case, however, we have sufficient evidence indicating that the damage arose from a single event in 1977. The jury found that the damage was not divisible and that it was the result of a sudden and accidental occurrence. Based on these findings, the only covered "occurrence" was the 1977 spill. The continual leaching of the chemicals from the soil into the groundwater did result in damages to SCSC because of property damage. However, only Allied's 1977 $100,000 primary policy and Tower's 1977 $1,000,000 excess policy are triggered. Damages in excess of the $1,100,000 aggregate limit of the primary and excess policies on the risk in 1977 are not covered. This result is consistent with the actual injury theory.

We reverse the decision of the trial court to the extent that it allocates damages to Tower and Allied for primary and excess policies that were not on the risk in 1977.

## VI.

Finally, SCSC argues that the court of appeals erred in rejecting the trial court's award of enhanced attorney fees pursuant to SCSC's contingency agreement with its attorneys. The trial court found not only that SCSC was entitled to enhanced attorney fees, but also found that a 50% enhancement was necessary to fully compensate SCSC's attorneys even though SCSC's contingency fee agreement provided for only a 25% enhancement. The trial court found that given the reasonableness of the hours billed, the complexity of the case, and the "undesirability" of coverage cases, SCSC's attorneys would not be doubly compensated by using a 1.5 multiplier. Moreover, the trial court found that SCSC's attorneys would not be fully compensated by an award of Lodestar fees alone.[4]

The court of appeals reversed the award of enhanced attorney fees. It noted

---

4. The Lodestar figure is calculated by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate.

*Anderson v. Hunter, Keith, Marshall & Co.,* 417 N.W.2d 619, 628 (Minn.1988).

that although public policy favors providing a fee enhancement as an incentive to private attorneys who bring civil rights lawsuits, no similar policy exists in insurance coverage actions. 515 N.W.2d at 603. The court of appeals went on to hold that although the base attorney fees sought were reasonable and necessary, the enhanced portion of the award was erroneous. *Id.* We agree.

Attorney fees are recoverable in a declaratory judgment action only if there is a breach of a contractual duty or statutory authority exists to support such recovery. *Morrison v. Swenson,* 274 Minn. 127, 137–38, 142 N.W.2d 640, 647 (1966). In this case, recovery is premised on Allied's breach of its contractual duty to defend. *See Lanoue,* 278 N.W.2d at 55 (stating that "the insured will not be required to pay the litigation costs of forcing the insurer to assume that burden").

SCSC is entitled to recover reasonable attorney fees it incurred bringing its declaratory action, but we agree with the court of appeals that SCSC is not entitled to receive the enhanced portion of those fees.

Affirmed in part, reversed in part and remanded.

ANDERSON, J., took no part in the consideration or decision of this case.