The HOME INSURANCE COMPANY,
et al., Respondents,

v.

NATIONAL UNION FIRE INSUR-
ANCE OF PITTSBURGH, Penn-
sylvania, Petitioner, Appellant,

Travelers Insurance Company,
Petitioner, Appellant.

No. C1–01–1429.

Supreme Court of Minnesota.

Feb. 20, 2003.

As Modified on Denial of Rehearing
April 3, 2003.

Robert E. Kuderer, Mark R. Azman, Teresa M. Thompson, Johnson & Condon, P.A., Minneapolis, for appellant, National Union.

Mathew M. Meyer, Thomas Shroyer, Moss & Barnett, P.A., Minneapolis, Thomas Holden, Jon K. Adams, Walnut Creek, CA, for appellant, Travelers.

James T. Martin, Gislason, Martin & Varpness, P.A., Edina, for respondents.

## OPINION

MEYER, Justice.

This case is part of Cargill, Inc.'s ongoing efforts to recover its expenses in defending itself and three of its subsidiaries in a patent infringement suit. We are asked to determine the nature and extent of three insurers' duties to reimburse Cargill for its defense costs. The patent infringement suit will be reviewed briefly, followed by Cargill's insurance coverage at the time of the suit, and then the legal issues in the instant case will be presented.

Life Point Systems, Inc. (Life Point) owned proprietary rights to three patents in a spread spectrum radio frequency device. Beginning in late 1988, Life Point attempted to negotiate licensing agreements with Cargill and several of its subsidiary companies: Waycrosse, Inc.; Willknight, Inc.; and Silent Knight Securi-

ty Systems, Inc. (we will refer to the four collectively as Cargill). In the course of negotiations, Cargill received various documents and information regarding the device after executing a confidentiality agreement. However, the negotiations ended without an agreement.

In May of 1993, Life Point sued Cargill (the Life Point action) alleging that the Cargill subsidiaries improperly used the Life Point Device in brochures and advertising, in soliciting business, and took advantage of confidential information disclosed during negotiations. The Life Point complaint alleged patent infringement, tortious interference of contract, divulgence of trade secrets, unfair competition, and false advertising. All counts included an allegation that the conduct complained of was ongoing and would continue unless enjoined by the court. In addition to injunctive relief, the Life Point complaint sought compensatory and treble damages totaling $460 million.

Cargill retained attorneys to defend the various Cargill entities under a joint defense arrangement. The joint defense was successful; the claims against Cargill in the Life Point action were dismissed. The defense costs totaled approximately $3 million.

During the period in question, Cargill or its subsidiaries were insured under general liability policies and umbrella policies from three different insurers: the Home Insurance Company (Home), Travelers Indemnity Company of Connecticut (Travelers), and National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union).

## A. Home Insurance Company

Upon being served with the complaint in the Life Point action, Cargill immediately notified its primary insurer, Home, by sending it copies of the Life Point complaint. Home accepted this tender of defense subject to a reservation of rights. Pursuant to that reservation of rights, Home commenced a declaratory action against Cargill seeking a declaration that it had no duty to defend or indemnify Cargill for the claims asserted in the Life Point action. That declaratory judgment action eventually was moved to federal court in Minnesota where a federal judge decided that Home indeed had to defend the suit. *Home Ins. Co. v. Waycrosse, Inc.*, 990 F.Supp. 720, 730–31 (D.Minn. 1996), *aff'd*, 131 F.3d 143 (8th Cir.1997). Neither Travelers nor National Union was involved in the suit and the federal court did not determine whether they shared any responsibility for the defense of the Life Point action.

Home continued to dispute its responsibility, and eventually Cargill and its subsidiaries brought suit to enforce the declaratory judgment in U.S. District Court in 1999. Four years after Home was first adjudged responsible, it entered into a loan receipt agreement with Cargill in May of 2000. In the loan receipt agreement, Home pledged to "loan" $2,450,000 to Cargill, as reimbursement for defense costs, while reserving its right to seek reimbursement from other insurers; Cargill released any claims against Home, and Cargill agreed to repay Home's "loan" with any settlement or judgment from National Union or Travelers.

## B. National Union Fire Insurance of Pittsburgh, Pennsylvania

Cargill had an umbrella policy from 1989 to 1994 through National Union with a limit of $25 million, and that policy listed as insureds: Waycrosse; Cargill; and any subsidiary in which Cargill had greater than 50% ownership. Thomas Peiffer, of Cargill's insurance department, sent a copy of the Life Point complaint to Nation-

al Union with a letter in July of 1993 (the complaint was initially served in May of 1993). His correspondence in July and August of 1993 pointed out that the defendants were Cargill subsidiaries and placed National Union "on notice of potential excess exposure." National Union responded to the notice from Cargill with a series of correspondence from its attorney, first asserting that the Life Point claims were not covered by the National Union policy and then simply closing the file.

Three provisions of the National Union policy are pertinent to this case: Insuring Agreement I, Insuring Agreement II, and the defense costs endorsement. Insuring Agreement I is an excess insurance provision, promising to pay Cargill for "net losses" it incurs that exceed the limit of its primary coverage. Insuring Agreement II is a gap-filling provision, promising to defend Cargill as a primary insurer for losses covered by National Union but not covered by the primary insurer. The defense costs endorsement is an indemnification provision, pledging to indemnify the underlying insurer for defense costs that exceed $750,000 if particular conditions are met.

### C. Travelers Insurance Company

Waycrosse, one of the Cargill subsidiaries and a defendant in the Life Point suit, was initially incorporated in Minnesota and insured under Cargill's primary policy with Home. After Waycrosse incorporated in Delaware,[1] it took out a general liability policy with Travelers from June of 1991 through at least 1995. Waycrosse II sent notice to Travelers of the Life Point action. Travelers responded in July of 1994 by denying coverage, based on an assertion that Waycrosse was acting through a joint venture, but reserving its right to assert additional defenses later.

### D. The present action

Prior to the loan receipt agreement, Home instituted this suit against National Union and Travelers, seeking reimbursement of defense costs incurred in the Life Point action. Cargill and the subsidiaries entered the suit as intervenors after the loan receipt agreement was finalized. Both National Union and Travelers moved for summary judgment.

The district court granted summary judgment to National Union and Travelers. The district court ruled that National Union did not have to reimburse Cargill for three reasons: (1) Cargill did not experience a "net loss" needed to invoke the excess coverage in Insuring Agreement I; (2) Cargill failed to specifically request that National Union defend it in the Life Point action, which was necessary to trigger National Union's duty to defend; and (3) Cargill did not comply with the conditions of the defense costs endorsement, rendering it inoperative. The district court also held that Travelers did not owe any reimbursement, because Travelers had no duty to defend Waycrosse since the Life Point complaint referred to the Minnesota version of Waycrosse (Waycrosse I), not the Delaware incarnation (Waycrosse II), and Travelers did not insure Waycrosse I.

The court of appeals reversed on four key issues. *Home Ins. Co. v. National Union Fire Ins.*, 643 N.W.2d 307 (Minn. App.2002). Although the court of appeals agreed that there had been no "net loss" as described in Insuring Agreement I, it found National Union was Cargill's primary insurer under the gap-filling provi-

---

**1.** In 1991 Waycrosse, Inc. incorporated in Delaware (Waycrosse II), and the Minnesota entity (Waycrosse I) merged into Cargill.

sions of Insuring Agreement II for the portion of Cargill's defense costs attributable to claims covered only by National Union. The court of appeals held that a specific request was not needed to invoke National Union's duty to defend as long as the insurer had notice of the suit and an opportunity to defend. It then ruled that since National Union had first breached its duty to defend under Insuring Agreement II, Cargill was excused from its failure to comply with the defense costs endorsement and National Union must indemnify Home. The court of appeals also held that Travelers owed reimbursement to Cargill because its insured was arguably named in the complaint.

This case presents six issues with respect to the obligations of Home, National Union, and Travelers to defend Cargill:

1. Whether Home has standing to seek reimbursement from National Union and Travelers for the defense costs incurred in the Life Point action.

2. Whether National Union owes reimbursement under Insuring Agreement I for defense costs incurred in the Life Point action.

3. Whether National Union's umbrella policy afforded broader coverage for advertising injury than Home's policy such that National Union's duty to defend was triggered under Insuring Agreement II.

4. Whether Cargill's "tender of defense" was sufficient to trigger National Union's duty to defend.

5. Whether Cargill's failure to give notice under the defense costs endorsement is excused by National Union's prior breach of its duty to defend.

6. Whether Travelers owes reimbursement for defense costs incurred.

## I.

■ This court has de novo review of all issues, both because this is an appeal from summary judgment and because the interpretation of insurance policies is a question of law. *Sentinel Mgmt. Co. v. Aetna Cas. & Sur. Co.*, 615 N.W.2d 819, 827 (Minn. 2000); *Haarstad v. Graff*, 517 N.W.2d 582, 584 (Minn.1994).

■ The first issue is whether Home has standing to sue National Union and Travelers for reimbursement of defense costs. National Union moved for summary judgment arguing that Home lacked standing to maintain an action against another insurer since there was no contractual relationship between the two insurers. The district court found that Home had standing to pursue reimbursement from National Union and Travelers for defense costs incurred in defending the Life Point action pursuant to the loan receipt agreement. The court of appeals affirmed. We agree and affirm the district court's determination.

■ The general rule is that one insurer cannot pursue reimbursement from another insurer for defense costs incurred in defending a mutual insured. *Iowa Nat'l Mut. Ins. Co. v. Universal Underwriters Ins. Co.*, 276 Minn. 362, 368–69, 150 N.W.2d 233, 237 (1967). However, we recognize an exception to this general rule when a loan receipt agreement is in place. *Jostens, Inc. v. Mission Ins. Co.*, 387 N.W.2d 161, 167 (Minn.1986). The loan receipt agreement in the instant case is substantively identical to the agreement entered into in *Jostens*, and gives Home standing to seek contribution. *See id.* at 163. Therefore, we hold that Home has standing to sue National Union and Travelers for reimbursement of defense costs.

## II.

■ The first substantive issue with respect to National Union's obligations is whether it owes any reimbursement under the excess coverage provided in Insuring Agreement I, which offers indemnification for any loss above the retained limit of the primary insurance. Cargill and Home, the primary insurer, seek to collect defense costs from National Union, the umbrella insurer, under Insuring Agreement I, in which National Union agreed:

> To pay on behalf of the Insured that portion of the ultimate net loss in excess of the retained limit as hereinafter defined, which the Insured shall become legally obligated to pay as damages for liability imposed upon the Insured by law, or liability assumed by the Insured under contract because of (i) personal injury, (ii) property damage, or (iii) advertising liability, as defined herein caused by an occurrence.
>
> * * * *

[Where "Ultimate Net Loss" is defined as:]

> * * * Except as provided in Insuring Agreement II, "Defense", the term "Ultimate Net Loss" shall mean the total sum which the insured, or any company as its insurer, or both become obligated to pay by reason of personal injury, property damage, or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical, and funeral charges and all sums paid or payable as salaries, wages, compensation, fees, charges, interest, expenses for doctors, nurses, and investigators and other persons, and for settlement, adjustment, investigation and *defense of claims* and excluding only the salaries of the Insured or any of the underlying Insurer's permanent employees.

> *The Company shall not be liable for expenses as aforesaid when such are covered by underlying policies of insurance whether collectible or not.*

(Emphasis added.) Relevant to our analysis is the language in the insurance policy providing that net loss includes defense costs and that losses are not collectible under Insuring Agreement I if covered by the primary policy. The district court reasoned that since Home had been adjudged to have a duty to defend, the excess coverage in Insuring Agreement I was not triggered. The court of appeals agreed, dismissing Home's contention that such a construction rendered the agreement illusory, or frustrated the insured's reasonable expectations.

Home's attempts to argue that Insuring Agreement I was either breached or was illusory are unpersuasive. Once the definitions of the policy terms are included, Insuring Agreement I is a promise by National Union to pay Cargill's legal liabilities that exceed either one million dollars (the retained limit) if the claim is uninsured, or the underlying insurance limits if any apply. Neither Home nor Cargill has alleged that the limits of Home's duty to defend Cargill were surpassed.[2] No breach can occur if the agreement was never triggered. Similarly, Home's argument that Insuring Agreement I is ambiguous and illusory is not persuasive. The agreement describes excess, not illusory, coverage. National Union's coverage under Insuring Agreement I, therefore, has not been triggered. We affirm the court of appeals and hold that Cargill and Home

---

2. Home's brief to this court mentioned that "[t]he Home policy certainly does not include costs of defense as part of the dollar limit of coverage," implying that there is no limit to its obligation for defense costs.

may not collect defense costs from National Union under Insuring Agreement I.

### III.

■ We next analyze whether Insuring Agreement II, the gap-filling provision of Cargill's policy with National Union, afforded broader coverage for advertising injury than Home's primary policy. Under Insuring Agreement II, National Union contracted to provide Cargill's defense in instances where National Union covered an injury that the underlying insurer (in this case Home) did not. Therefore, if some of the claims in the Life Point action were covered solely by National Union, National Union had a duty to defend Cargill. The relevant part of the policy reads:

> (The provisions of this Insuring Agreement apply solely to occurrences covered under this policy but not covered by any underlying policies listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured, whether collectible or not. This Insuring Agreement shall also apply to occurrences not covered by any underlying insurance due to exhaustion of any aggregate limits by reason of any losses paid thereunder.)

> The Company shall:

> (a) defend any suit against the Insured alleging liability insured under the provisions of this policy and seeking recovery for damages on account thereof even if such suit is groundless, false or fraudulent, but the Company shall have the right to make such investigation and negotiation and settlement of any claim or suit as may be deemed expedient by the Company.

This policy term is essentially identical to the umbrella insurer's policy language in *Jostens*, 387 N.W.2d at 165 n. 3. We held in *Jostens* that this policy term obligated the umbrella insurer to pay for defense costs for defending claims arising solely under the umbrella insurer's broader (thus primary) coverage.

. National Union contends that its coverage was not broader than Home's coverage because it did not cover any types of loss that Home did not also cover. If National Union is right, that its coverage was merely excess, then it had no duty to defend under Insuring Agreement II. The district court found National Union's coverage was broader because the National Union policy included the term "unfair competition" in its definition of advertising injury, while the Home policy did not. The court of appeals agreed that National Union's advertising injury coverage was broader, noting that it also included defamation and piracy, while Home's did not.

■ A duty to defend an insured arises if any part of the claim is *arguably* within the scope of the policy's coverage, and the burden is on the insurer to prove that a claim clearly falls outside the coverage. *Prahm v. Rupp Constr. Co.*, 277 N.W.2d 389, 390 (Minn.1979). We are persuaded, as were the lower courts, that some of the claims in the Life Point action were *arguably* covered under Insuring Agreement II, and not covered by underlying policies, triggering National Union's duty to defend. In the first policy period, National Union's coverage was broader in that it covered "idea misappropriation under an implied contract," while Home had no such provision. In the second policy period, National Union's coverage was broader by covering defamation, piracy, and unfair competition, while Home's coverage had no such provisions. These additional terms are important in a lawsuit that alleges Cargill divulged trade secrets, competed unfairly, and infringed patents among other claims. Thus, National Union is liable for defense costs associated

with those claims on which its coverage is primary.

■ National Union further argues that Cargill failed to maintain the requisite primary coverage during the period of National Union's umbrella coverage, which increased National Union's exposure on the policy and, in effect, converted its excess coverage to umbrella coverage. In other words, had Cargill properly maintained the requisite underlying coverage, National Union's coverage would not be implicated because all claims would be covered on the primary policies. National Union urges us to hold that its coverage is not primary on *any* of the Life Point claims because Cargill did not adequately maintain its primary coverage. Under Insuring Agreement II, Cargill was required to *maintain* consistent primary insurance coverage during the period of the umbrella policy. The relevant part of the National Union policy reads:

> **Maintenance of Underlying Insurance.** The policy or policies referred to in the attached "Schedule of Underlying Insurances," and any renewal or replacement thereof, not more restrictive, shall be *maintained* by the Insured in full effect during the currency of this policy *without alteration of terms or conditions* except for any reduction of the aggregate limit or limits contained therein solely by payment of claims. Failure of the Insured to comply with the foregoing shall not invalidate this policy but in the event of such failure, the Company shall only be liable to the same extent as it would have been had the Insured so maintained such policy or policies.

(Emphasis added.) During the first umbrella policy period, June 1989 to June 1990, National Union's policy language required Cargill to maintain its primary insurance without change of terms or conditions. The primary insurer, Home, did change its definition of advertising injury in the middle of that policy period. Even at the beginning of that period, however, National Union's umbrella policy was broader than Home's primary policy because it covered claims for "idea misappropriation under an implied contract," leaving open a possibility that such claims would be covered only by National Union. We conclude that because National Union's umbrella coverage at the beginning of the first policy period was broader than the primary coverage *then in force,* a subsequent narrowing of the primary coverage during the first policy period does not totally relieve National Union of its duty to defend.

■ When National Union agreed to a second umbrella policy with Cargill in 1990, Home's definition of advertising injury had *already* changed. Home's policy with Cargill in effect starting in January 1990 no longer included defamation, piracy, and unfair competition, as had the Home policy in effect from 1988, but had a new provision covering "misappropriation of advertising ideas or styles of doing business." Cargill's underlying coverage was consistent during the period of the new policy as required. During the second umbrella policy period, National Union's coverage was broader than Home's coverage and indemnified against defamation, piracy, and unfair competition. We conclude that Cargill properly maintained its primary policies during the second policy period and National Union's coverage became primary for claims under its broader coverage, triggering its duty to defend. We hold that Insuring Agreement II is triggered and National Union is liable for defense costs associated with those claims on which coverage is primary.

## IV.

Having determined that National Union's policy was at least arguably primary

with respect to one or more of the Life Point claims, we turn now to the question of what constitutes a legal "tender of defense" sufficient to trigger an insurer's duty to defend. The district court opined that an insured must make an express request for defense, while the court of appeals determined that an insured's notice to the insurer with an opportunity to defend is sufficient. At issue is whether Cargill's tender to National Union triggered a duty to defend. National Union's umbrella policy provides that with respect to occurrences not covered by underlying insurance, National Union shall defend any suit "alleging liability insured under the provisions of this policy and seeking recovery for damages on account thereof." The policy further required Cargill to give "immediate notice" to National Union "[w]henever the insured has information from which the insured may reasonably conclude that an Occurrence covered hereunder * * * is likely to involve this policy."

The Life Point complaint was sent to Cargill's insurance department. Thomas Peiffer, an attorney in the insurance department with the title of "Casualty Insurance Specialist," provided a copy of the Life Point complaint to National Union in July of 1993. After requesting more information, Jonathan Sher, an attorney for National Union, responded by letter in December of 1993 and suggested that none of the claims in the Life Point action were covered under the National Union policy. Sher also questioned whether Cargill had maintained the appropriate underlying insurance. Cargill responded immediately by confirming its underlying policies. National Union closed its file, after twice referring to the defense of the Life Point suit having been "tendered." In 1995, National Union revisited the issue and wrote letters to Cargill opining that the underlying claim did not implicate its policies.

When Home sued National Union for a portion of Cargill's defense costs, National Union refused, claiming it did not owe any of Cargill's defense costs because Cargill never gave a "formal tender of defense" to National Union. The district court agreed and determined that Cargill had not "tendered the defense" to National Union insofar as Cargill had failed to make "a specific request for a defense." The court of appeals reversed and held that once an insured gives the insurer both notice of a claim and the opportunity to defend, the tender is complete. We affirm the court of appeals.

■ Before an insurer's duty to defend is triggered, "the formal tender of a defense request is a condition precedent to the recovery of attorney fees that a party incurs defending claims that a third party is contractually obligated to pay." *SCSC Corp. v. Allied Mutual Ins. Co.*, 536 N.W.2d 305, 316 (Minn.1995). In *SCSC Corporation*, an insured had to pay out-of-pocket its cleanup, investigation, and defense costs stemming from a groundwater contamination claim, and sued its primary insurer and umbrella insurer to recover the defense costs. *Id.* at 309–10. SCSC, the insured, did not inform the primary insurer of the occurrence until almost one year after the regulatory agency contacted SCSC. *Id.* at 317. At that time, SCSC specifically requested the insurer indemnify its losses. *Id.* This court held that SCSC did not invoke the insurer's duty to defend until it tendered its defense request, so only the costs incurred after the tender of defense had to be reimbursed. *Id.* Because SCSC had specifically requested indemnification, we did not determine whether its tender of defense was legally sufficient in that case, and we have not since enunciated the content of a tender of

defense.[3]

As there is no Minnesota decision regarding what constitutes tender, it is instructive to review what other states have done. While there are relatively few state supreme courts that have directly addressed the issue, of the three state supreme courts that have, all have ruled that notice of suit is sufficient to tender a defense. In 1998, the Illinois Supreme Court held that an insured's notice to the insurer of the lawsuit was enough to constitute tender. *Cincinnati Cos. v. West Am. Ins. Co.*, 183 Ill.2d 317, 233 Ill.Dec. 649, 701 N.E.2d 499, 504 (1998) (holding "the better rule is one which allows actual notice of a claim to trigger the insurer's duty to defend, irrespective of the level of the insured's sophistication, except where the insured has knowingly forgone the insurer's assistance").[4] New Hampshire and Wisconsin have also determined that putting an insurer on notice of a claim constitutes tender. *White Mountain Constr. Co. v. Transamerica Ins. Co.*, 137 N.H. 478, 631 A.2d 907, 910 (1993) (holding that "in

order for an insured to tender the defense to the insurer, it need only put the insurer on notice of the claim"); *Towne Realty, Inc. v. Zurich Ins. Co.*, 201 Wis.2d 260, 548 N.W.2d 64, 67 (1996) (holding that "[a] tender of defense occurs once an insured has been put on notice of a claim against the insured").[5]

■ We agree with the supreme courts of Illinois, New Hampshire, and Wisconsin that sound public policy does not support a rule that requires insureds to expressly request a defense in order to trigger the duty to defend. Three broad reasons support defining "tender" as giving the insurer notice and opportunity to defend a covered lawsuit: first, it clarifies the duties of the parties early in the litigation; second, it acknowledges the greater knowledge and sophistication of the insurer; and third, it places no significant burden on insurers.

A rule that defines tender as an insured's actions in giving the insurer notice of a lawsuit and the opportunity to defend

---

**3.** In 1996, the Eighth Circuit attempted to give content to "formal tender" under Minnesota law by looking at the facts of *SCSC Corporation* to determine what we meant by formal tender. *See C.J. Duffey Paper Co. v. Liberty Mut. Ins. Co.*, 76 F.3d 177, 178 (8th Cir.1996). Because the Eighth Circuit misunderstood the timing of the notice given to the insurer in *SCSC*, it concluded that we had implicitly decided notice was not enough. *Id.* at 178. In fact, *SCSC* did not inform its insurer of the claim until it asked for indemnification, so there was no period in which the insurer had notice but no request for coverage. *SCSC Corp.*, 536 N.W.2d at 317.

**4.** Cases from the Seventh Circuit are frequently cited as adopting a rule that notice is not sufficient to constitute tender of defense. *See, e.g., Aetna Cas. & Sur. Co. v. Chicago Ins. Co.*, 994 F.2d 1254, 1261 (7th Cir.1993); *Hartford Accident & Indem. Co. v. Gulf Ins. Co.*, 776 F.2d 1380, 1383 (7th Cir.1985). These cases, however, were decided before

the Illinois Supreme Court held in *Cincinnati Cos. v. West American Ins. Co.*, 183 Ill.2d 317, 233 Ill.Dec. 649, 701 N.E.2d 499, 504 (1998), that actual notice may trigger the duty to defend.

**5.** Intermediate courts in Louisiana and Pennsylvania appear to have reached the same result. *See Cobb v. Empire Fire & Marine Ins. Co.*, 488 So.2d 349, 350 (La.Ct.App.1986); *Widener Univ. v. Fred S. James & Co.*, 371 Pa.Super. 79, 537 A.2d 829, 833 (1988). *But see Litton Systems, Inc. v. Shaw's Sales & Serv., Ltd.*, 119 Ariz. 10, 579 P.2d 48, 52 (Ct.App.1978) (stating that notice must "contain full and fair information concerning the pending action and an unequivocal, certain and explicit demand to undertake the defense thereof"); *Unigard Ins. Co. v. Leven*, 97 Wash. App. 417, 983 P.2d 1155, 1160 (1999), *rev. denied*, 140 Wash.2d 1009, 999 P.2d 1263 (2000) (holding an "insured must affirmatively inform the insurer that its participation is desired").

clarifies the roles and responsibilities of interested parties as early as possible. By disallowing the formation of a potential loophole for insurers around what constitutes an express request for defense, we clarify the duties of insurers and protect the bargain struck by the parties in the insurance policy. The insured paid for the insurer's promise to defend the insured for covered claims, and the insured's ignorance regarding the language the insured must use to invoke that coverage should not negate the bargain. *See Cincinnati Cos.*, 233 Ill.Dec. 649, 701 N.E.2d at 505; *White Mountain*, 631 A.2d at 910.

Our holding encourages the prompt resolution of coverage disputes we extolled in *Jostens* by clarifying when an insurer's duty to defend is triggered. *Jostens*, 387 N.W.2d at 167. Once the insurer's duty to defend is triggered, it must begin defending the suit or bring a declaratory action if it believes the policy does not cover the claim. *See id.* Forcing the insurer to take one of these two steps as soon as it receives notice of a claim helps the parties move on with the underlying suit. Once an insurer receives notice of a suit, it is responsible for defending the insured unless the insured explicitly refuses the insurer an opportunity to defend.

The relationship of an insured to its insurer is not one of equals, and a rule defining tender as notice and opportunity to defend reflects that disparity. Both primary and umbrella insurers are typically more sophisticated than the insured—they know their policies intimately, including their duties under the contract and how courts have interpreted language in the policies. *See Cincinnati Cos.*, 233 Ill. Dec. 649, 701 N.E.2d at 504–05. We will not create a legal rule that presumes an insured, whether a company or an individual, is equally sophisticated, knowing its contractual right to coverage and when

and how to invoke it. Nor will we create a rule that "interpret[s] an insured's silence as a statement of intent to forgo the insurer's assistance." *Id.* at 505. Indeed, insurers are better able to "facilitate clear communication between the parties." *Towne Realty*, 548 N.W.2d at 67; *see also White Mountain*, 631 A.2d at 910.

The inequities inherent in the insurance relationship are not as manifest in this case as in an average coverage dispute. Most companies facing a multi-million dollar lawsuit will not have a parent company with deep enough pockets to ensure they have quality legal representation after their insurers abandon them. Nor would most companies have an experienced, in-house insurance department at their disposal. Instead, a smaller company left stranded by its insurer might be unable to afford a defense. And the average insured *individual* is likely to be even less knowledgeable about its contractual rights than a company, making the disparity between the insurer and insured even greater.

■ Once notice is given, even without an express request for a defense, it should be the responsibility of the insurer to contact the insured to determine whether the insurer's assistance in the suit is required. The burden we are placing on the insurer with this rule is not onerous, as the Illinois and Wisconsin courts have noted. *Cincinnati Cos.*, 233 Ill.Dec. 649, 701 N.E.2d at 505; *Towne Realty*, 548 N.W.2d at 67. When notified of the insured's potential liability under the suit, the insurer "can simply ask the insured if the insurer's involvement is desired, thus eliminating any uncertainty on the question." *Cincinnati Cos.* at 504. While in *SCSC Corporation*, 536 N.W.2d at 316–17, we wanted to make sure that insurers could not be saddled with defense costs over which they had no control, this is not a concern here. The "notice and opportunity to defend"

rule we adopt ensures insurers will not be surprised when defense costs are foisted on them.

We hold that once an insured provides its primary or umbrella insurer with notice of a suit and opportunity to defend, it has tendered the defense as required by *SCSC Corporation*. On the record before us, therefore, we conclude that Cargill legally tendered its defense to National Union as required by Insuring Agreement II.

## V.

■■■ Home seeks to enforce the provisions of Cargill's defense cost endorsement with National Union in which National Union agrees to repay the primary insurer for defense costs exceeding $750,000 as long as the insured notifies National Union that costs are approaching that level and obtains consent. Application of the endorsement would greatly benefit Home: the defense costs in the suit exceeded two million dollars, entitling Home to recover over one million. Under the contract, the insured is obligated to communicate with National Union as follows:

> The company shall indemnify the particular underlying insurer(s) of the Insured on a per occurrence basis for all costs of defending the Insured in excess of $750,000.

> The Insured shall notify the company when it is reasonably apparent to the Insured that "defense costs" will reach $750,000 and shall obtain the written consent of the company before incurring additional fees, costs or expenses, such consent not to be unreasonably withheld.
> \* \* \* \*

> With regard to an occurrence, failure of the Insured to obtain the written consent of the company set forth above, shall render this endorsement without effect as to that occurrence.

The district court determined that Cargill's failure to notify National Union that defense costs had reached $750,000 resulted in complete forfeiture of Home's indemnification rights. The court of appeals did not reach the notice issue, concluding instead that "National Union breached its insurance contract prior to implication of the notice requirement." *Home Ins.*, 643 N.W.2d at 325. The court of appeals held that because National Union breached the insurance contract by not defending Cargill in the Life Point action, and the breach occurred prior to implication of the notice requirement, Cargill was excused from providing notice under the contract.

We agree that National Union's failure to defend Cargill in the Life Point action breached its insurance contract. *See Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 740 (Minn.1997) (treating the insurer's failure to defend as a breach of contract). And because we agree that National Union's breach suspended performance under the contract by Cargill, Cargill's failure to provide notice that defense costs were reaching $750,000 is excused. *See Space Center, Inc. v. 451 Corp.*, 298 N.W.2d 443, 451 (Minn.1980) (noting that "a repudiating party cannot set up the other party's subsequent nonperformance or a breach to avoid liability for its own prior total breach"). *Accord* Restatement (Second) of Contracts § 237 (1981) ("it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time"). While the remedy for breach is generally to grant the nonbreaching party the benefit of the bargain, *Domtar*, 563 N.W.2d at 739, it is another matter to extend the benefit of the bargain to Home, a third party to the contract.

When a third party to the contract seeks to enforce an indemnification right that runs to the benefit of that third party, equitable principles must be applied. *See Hermeling v. Minnesota Fire & Cas. Co.,* 548 N.W.2d 270, 273 n. 1 (Minn.1996) (noting that indemnity and contribution are both remedies based on equitable principles), *overruled on other grounds by Oanes v. Allstate Ins. Co.,* 617 N.W.2d 401 (Minn.2000). It is a well-established principle that "one who comes into equity must come with clean hands." *Fred O. Watson Co. v. U.S. Life Ins. Co.,* 258 N.W.2d 776, 778 (Minn.1977). While it is true that National Union failed to provide a defense in the Life Point action, neither did Home, the primary insurer, provide such a defense. Indeed, if Home had honored its policies it would have defended Cargill beginning in June of 1993. Hypothetically, if Home had provided Cargill's defense, it seems likely that Home would have, in the normal course of providing that defense, alerted National Union as defense costs approached $750,000. Instead, Home nominally agreed to defend and then never paid any defense costs until it faced an enforcement action six years later. Therefore, because this case reaches us on appeal from summary judgment with very little information in the record, we remand to the district court to determine whether Home has the requisite "clean hands" to enforce this indemnification provision against National Union. In particular, the district court is to focus on Home's knowledge and action with respect to the Life Point action from 1993 onward.

## VI.

We turn now to answer whether Travelers owes reimbursement for defense costs incurred. Travelers is implicated because it provided primary insurance coverage for Waycrosse, Inc. (one of Cargill's subsidiary companies) from June 1991 through June 1993, a period of time covered by the Life Point complaint. Waycrosse, Inc. (Waycrosse I) was a Minnesota corporation until June 1991 and insured under Home's policy. A new entity was then formed with the same name, but incorporated in Delaware (Waycrosse II), with the Minnesota entity merging into Cargill. Both Waycrosse companies operated out of Cargill's offices in Minnesota with the same employees and conducted the same business operations. When Waycrosse was sued in the Life Point action, it sent notice to Travelers of the Life Point complaint, and Travelers responded by refusing to defend and denying coverage under a joint venture exclusion. Later, Travelers refused to defend and claimed that the Life Point complaint only implicated Waycrosse I and none of the claims even arguably implicated Waycrosse II.

The district court granted Travelers' motion for summary judgment and determined that the Waycrosse company named in the Life Point complaint was not Travelers' insured. The court of appeals disagreed. The court of appeals applied the summary judgment principle that facts must be construed in the light most favorable to the nonmoving party and held that the Life Point complaint implicated Waycrosse II, which Travelers insured.

In addition to the summary judgment principle favoring the nonmoving party, two rules of construction weigh against granting summary judgment to Travelers in this case. First, courts are to construe pleadings liberally. *L.K. v. Gregg,* 425 N.W.2d 813, 819 (Minn.1988). Second, "[a] duty to defend an insured on a claim arises when any part of the claim is 'arguably' within the scope of the policy's coverage, and an insurer who wishes to escape that duty has the burden of

showing that all parts of the cause of action fall clearly outside the scope of coverage." *Jostens,* 387 N.W.2d at 165. When we construe the complaint liberally, a claim is arguably made against Travelers' insured, Waycrosse II, bringing the suit within Travelers' duty to defend.

The Life Point complaint does not appear cognizant of the two Waycrosse corporations. In the caption it names "Waycrosse Inc., now merged into Cargill, Inc., a Delaware corporation." That description implicates both Waycrosse entities—Waycrosse I because it had merged into Cargill, and Waycrosse II because it is a Delaware corporation (while Waycrosse I was not). Thereafter, the Life Point plaintiffs continually refer to Cargill, naming Waycrosse as a member, even when describing activities after Waycrosse I ceased to exist in June 1991. The complaint also seeks injunctive relief against Waycrosse, which was only possible from Waycrosse II, since Waycrosse I was no longer in existence. The complaint was sufficiently unclear that Travelers did not even raise this defense to coverage originally. Given that we are to construe pleadings broadly, and a duty to defend arises when any claim is arguably covered, we affirm the court of appeals' ruling and hold that Travelers had a duty to defend its insured, Waycrosse, Inc.

We affirm in part, reverse in part, and remand to the district court for further proceedings in accordance with this opinion.

HANSON, J., took no part in the consideration or decision of this case.