SCOTTSDALE INSURANCE COM-
PANY, Plaintiff (C8–02–1924),
Respondent (C0–02–2114),

v.

TRANSPORT LEASING/CONTRACT,
INC., et al., Defendants and Third
Party Plaintiffs, Respondents (C8–02–
1924), Appellants (C0–02–2114),

RLI Insurance Company, Defendant
and Third Party Plaintiff (C8–02–
1924), Respondent (C0–02–2114),

v.

Insurance Brokers Service, Inc., Third
Party Defendant, Summit Global
Partners, Inc., of Illinois, Inc., et al.,
Appellants (C8–02–1924), Third Party
Defendant (C0–02–2114).

Nos. C8–02–1924, C0–02–2114.

Court of Appeals of Minnesota.

July 22, 2003.

Mark J. Ayotte, Matthew A. Slaven, Briggs and Morgan, P.A., St. Paul, MN; and Steven A. Pletcher, Scopelitis, Garvin, Light & Hanson, P.C., Indianapolis, IN, for appellants Transport Leasing/Contract Inc., ATS, Inc. and ATS, Inc. of Georgia.

Todd A. Wind, Crystal M. Ovsak, Fredrikson & Byron, P.A., Minneapolis, MN, for appellants Summit Global Partners, Inc. and Michael P. Lopeman.

Thomas P. Kane, Sean R. Simpson, Hinshaw & Culbertson, Minneapolis, MN, for respondent Scottsdale Insurance Company.

Joel M. Muscoplat, Gislason, Martin & Varpness, P.A., Minneapolis, MN; and

William T. Corbett, Jr., admitted pro hac vice, Drinker, Biddle & Shanley LLP, Florham Park, NJ, for respondent RLI Insurance Company.

Considered and decided by TOUSSAINT, Chief Judge, STONEBURNER, Judge, and MINGE, Judge.

## OPINION

MINGE, Judge.

This action was initiated by respondent Scottsdale Insurance Company to determine its liability for claims against appellant, insured, Transport Leasing Company and its subsidiaries (TLC) under the non-owned auto endorsement to a liability insurance policy and was expanded by third-party actions initiated by TLC. The district court found that the insurance policies with the endorsements issued by the respondent insurance companies covered accidents of truck drivers employed by TLC and leased to trucking firms, but entered partial summary judgment rescinding the insurers' liability for such leased drivers. TLC challenges the summary judgment determination of rescission. Respondent insurers appeal denial of summary judgment of their alternative claim that the nonowned auto endorsement does not cover the damages arising out of accidents of these leased truck-driver employees of TLC. Appellants' insurance agency and insurance agent challenge the refusal of the district court to enter summary judgment relieving them of liability to TLC for failure to obtain insurance for accidents of leased truck drivers. This court granted discretionary review.

Because we conclude that the nonowned auto endorsement to the insurance policies does not cover accidents of TLC's leased truck-driver employees and because we do not reach the issue of rescission, we re-verse the determination that there was coverage and affirm on different grounds the grant of summary judgment in favor of the insurers. Because we agree with the district court that the claims of TLC against the insurance agency and the insurance agent are not suitable for summary judgment, we affirm the denial of summary judgment to those appellants.

## FACTS

TLC is the parent company of ATS, Inc. and ATS, Inc. of Georgia, and we will refer to the collective companies as TLC. TLC employs truck drivers and loans those drivers to various trucking firms, usually as full-time employees. In many cases these drivers had been regular employees of the trucking firm prior to the TLC arrangement. TLC describes its business as "employee leasing."

Through the employee leasing arrangement, TLC provides the trucking companies with services including handling the drivers' payroll, payroll taxes, worker's compensation insurance, and upon request, health insurance plans, 401(k) programs, and disability benefits. Also upon request, TLC monitors driver compliance with physical examination requirements and the driver's license status of each employee. By serving as the employer, TLC allows trucking firms to contract out these portions of the employers' responsibilities. Otherwise, the trucking firms fully control all aspects of the leased drivers' work activity.

Prior to 1997, TLC intentionally did not carry any liability insurance coverage on any of the leased truck drivers. Instead, TLC relied upon indemnification agreements and lease requirements that TLC be named as an additional insured on the insurance policies of the trucking firms. TLC believed that because it did not control the day-to-day activities of the leased

truck drivers, it would not be held vicariously liable for their acts.

In February 1997, an investor in TLC asked an insurance broker, Aon Corporation, to evaluate TLC's insurance coverage, to identify insurance risks, and to recommend needed coverage. Aon expressed concern that TLC was potentially exposed to a huge risk if a trucking customer carried insufficient liability insurance or allowed insurance to lapse. Aon recommended that TLC purchase a full liability policy covering the leased drivers and submitted a bid to TLC for such a policy with a yearly cost of $25,000.

TLC requested that appellant insurance agent Michael Lopeman and appellant Summit Global Partners (Summit), the firm for which Lopeman worked, obtain liability insurance coverage for TLC. Lopeman had been working with TLC on insurance matters since 1994. Lopeman testified in his deposition that because of his experience with several transportation businesses, he was knowledgeable about transportation insurance. Lopeman did not acquire the liability coverage directly. Instead, he submitted coverage requests to a wholesale insurance broker, Insurance Brokerage Services (IBS), and IBS in turn submitted the information to appellants Scottsdale Insurance Company and RLI Insurance Company. Scottsdale wrote basic coverage with $1 million limits and RLI wrote $25 million commercial umbrella coverage. Included in the application for coverage were the following:

- A letter from Lopeman describing TLC as "an employee leasing company headquartered in Minnesota * * * [that] specializes in leasing small groups of drivers to existing larger trucking companies."
- A business vehicle insurance application form requesting nonowned liability coverage and listing Minnesota and Indiana as business locations with the size of their offices even though TLC had drivers in 48 states.
- A profit and loss statement listing driver wages at over $27.1 million as of June 30, 1996 (the 1998 renewal application listed payroll at $46.5 million).
- A statement that TLC had 1,900 employees and a payroll of $46.5 million on the 1997 RLI application form.

The underwriter at Scottsdale testified in his deposition that he did not consider the financial information, payroll information, description of TLC's business, or the business vehicle form when evaluating the request for coverage. He testified that he "never imagined" that TLC's leased truck drivers would be covered by the nonowned vehicle endorsement and that he based the underwriting on the reported square footage of TLC's office, assuming the endorsement was for office-employee exposure. Based on this assessment of risk, Scottsdale/RLI quoted a premium of $300 for the nonowned auto endorsement. Because Aon had quoted a premium of $25,000, TLC questioned Lopeman about the difference in the two bids. On February 3, 1997, Lopeman sent the following memo to TLC:

The program we proposed includes a quote for Non Owned Auto with a $1,000,000 limit. For this quote, we provided the insurance company with information on how your business operates. In other words, the auto exposure is insured by your clients and your clients agree under contract that they will hold you harmless and indemnify you for any loss. Therefore, the insurance company sees the exposure as TLC's actual office employees and has priced the coverage accordingly.

Based on what I've heard regarding the other quote you received for an auto policy, I don't believe the underwriter fully understands the exposure of TLC.

The TLC officer in charge of insurance testified in his deposition that he had approximately ten conversations with Lopeman regarding nonowned auto coverage. He stated that Lopeman told him that TLC would have liability coverage related to the trucks operated by their customers under the nonowned auto policy and the general liability policy. The TLC officer also testified that TLC requested the insurance coverage for the truck drivers because "it was mandated as a result of * * * [the] transaction with [the investor in TLC]" and that he trusted Lopeman's judgment.

Lopeman testified that he could not recall what generated his February 3, 1997 memo to TLC. He testified that he remembered TLC asking for coverage for the office employees, but he did not remember TLC asking for coverage for the leased truck-driver employees. Lopeman did not deny that TLC asked for coverage for the leased truck-driver employees; he testified only that he did not recall such a request. The initial proposals from Lopeman were for a coverage period of December 31, 1996 to December 31, 1997. TLC purchased the Scottsdale/RLI liability coverage with the nonowned auto endorsement through Lopeman and Summit. TLC asserts that it understood this endorsement would cover its leased truck-driver employees.

On October 27, 1997, TLC requested that Aon again analyze TLC's insurance coverage. Included in the second request was a list of "the types of insurances, the issuing companies, the policy dates, and the dollar amount of the coverages" currently held by TLC. On December 3, 1997, TLC provided Aon with copies of TLC's general liability policy provided by Scottsdale and excess liability provided by RLI. In the December 3, 1997 letter, TLC stated

the TLC Companies would like you to see to it that the appropriate people at AON and/or AIG critically analyze and review our entire insurance portfolio for cost, adequacy of coverages, existence of any gaps or overlaps in coverages, effectiveness of our umbrella policy in supplementing the coverages afforded by our other policies (where appropriate), etc.

After the review is completed, we would request that you prepare a detailed letter in which you give us advice and suggestions on changing our insurance portfolio to make absolutely certain—from an insurance point of view—that all of the TLC Companies' interests and assets are properly and adequately protected.

The TLC official then arranged a conference call between a TLC executive and Aon for February 13, 1998. A TLC fax setting up the meeting stated

[Aon's agent] stressed that he is particularly concerned with the probable lack of coverage under the "Hired Auto and Non-Owned Auto Liability" endorsement on our Scottsdale General Liability policy. He stated that the extent of the coverage is not entirely clear, but that the low premium, combined with the murky language, leads him to suspect we may have some real exposure if one of our employees were to drive someone else's vehicle and have an accident. He cited as a nightmare scenario an accident where one of our leased drivers in a truck plows into a school bus. [Aon's agent] described the potential liability there as possibly "wiping out the company."

Some time after that, TLC posed the hypothetical truck crashing into the school bus scenario to Lopeman and questioned Lopeman about the coverage available for that scenario. TLC did not ask Lopeman

to analyze its coverage, nor was Lopeman told that Aon was analyzing TLC's coverage. Lopeman's faxed response on March 12, 1998 was as follows:

With regard to coverage in the event (example) an employee leased by TLC to a trucking company is driving a company truck and hits a school bus causing serious injury to the children and TLC is brought into the suit by the claimants:

1. As the underwriter knew the number of employees and the fact that TLC is in the employee leasing business and

2. the policy does not have a specific exclusion for leased employees

the policy would provide coverage to TLC, but would not provide any coverage to the owner of the truck.

Also on March 12, 1998, Mary Lovell, another agent at Summit and an assistant to Lopeman, sent a memo to TLC regarding the hired/nonowned vehicle coverage versus contingent vehicle coverage. The memo stated:

I have received confirmation from the underwriter that TLC would have coverage in the event that one of your employees uses their own personal automobile in connection with their employment **whether or not** the employee had auto liability coverage. The coverage is provided under non-owned auto liability as described below:

Nonowned Auto is autos you do not own, lease, hire, rent or borrow that are used in connection with your business. This **includes** autos owned by your employees or partners or members of their households but only while used in your business.

Hired Autos picks up the autos you do lease, hire, rent or borrow, but does not include vehicles borrowed from any of your employees.

As you can see, both coverages are required as they cover different situations. The insurance policies defined "auto" to include trucks and other vehicles. Lovell stated in her deposition that she did not recall any conversations with TLC personnel about endorsements providing hired and nonowned auto coverage. Summit asserts that Lovell's memo was in response to another scenario posed by Lopeman. In this scenario, an office employee would be in an accident while using a personal auto for company errands. According to Summit, TLC was particularly interested in knowing what would happen if the driver had no insurance.

Despite Aon's concerns, TLC stated that it relied on and trusted Lopeman's opinion that truck drivers were covered and did not purchase any additional coverage in late 1997 or early 1998. Aon stated that in its opinion, TLC's liability exposure was the "contingent automobile risk." In response, TLC disagreed and indicated to Aon's official that he had limited understanding of the risk. The Aon official also stated that the reason for TLC's view of their insurance needs was that

it was [TLC's] understanding that the clients that they were leasing employees to were statutorily obligated to maintain automobile insurance. On that basis [TLC] had no worries on that issue.

The initial policies from Scottsdale and RLI ran from February 20, 1997 to February 20, 1998, and they were renewed in February 1998. On April 23, 1998, Summit sent TLC's chief financial officer two supplemental questionnaires from Scottsdale; the questionnaires covered the endorsements providing hired vehicle and nonowned vehicle coverage. The questions on the forms addressed why hired and nonowned coverage was requested, how many autos were to be scheduled on the policies, the estimated annual mileage

usage, and the maximum distance the non-owned auto was to be driven.

Because TLC did not return the forms to Summit, Summit sent them again on June 11, 1998. On June 18, 1998, TLC's CFO signed the questionnaires, and they were faxed to Summit. The answers on the questionnaires indicated that the coverage was for employee vehicles used in employee errands for a maximum distance of 1.5 miles. According to the CFO, he did not fill out the forms, but neither he nor anyone else at TLC could determine who completed them. The CFO had no responsibilities for insurance issues at TLC; the person who did have the responsibility had no knowledge of the forms and did not know why the forms were sent to TLC. Neither Lopeman nor Lovell participated in filling out the questionnaires or recalled reviewing them once they were sent back by TLC. Summit simply forwarded the questionnaires to Scottsdale.

■ The precipitating event for this consolidated appeal was a fatal truck/auto accident on May 27, 1999, in Tennessee. The driver of the truck, Roger Dale Walker, was an employee of ATS, Inc. of Georgia, which is a subsidiary of TLC. He was leased to Mercer Trucking in Georgia. The accident resulted in the deaths of four people. The jury in the resulting personal injury case found that TLC was vicariously liable for Walker's conduct. Judgment was entered jointly and severally against TLC's subsidiary and Mercer Trucking in the amount of $24.5 million, including $15 million in punitive damages.[1]

TLC notified Scottsdale of Walker's accident. Scottsdale denied coverage stating [t]he accident arose out of an * * * accident in which an employee leased to Mercer Trucking was operating a vehicle owned by Mercer Trucking for a purpose benefiting Mercer Trucking. As he was operating a nonowned vehicle for the use of Mercer Trucking as opposed to your business, there is no coverage for this loss under this policy. At this time, under these circumstances, Scottsdale Insurance Company must respectfully disclaim coverage for this claim. We will not participate in the indemnification of this matter.

The coverage was also denied by RLI under the umbrella policy. In a second letter to TLC, Scottsdale again denied coverage for Walker's accident, stating that TLC's business was employee leasing and that TLC was not in the business of transporting goods. Scottsdale also asserted that it was entitled to rescind coverage "based on [TLC's] material misrepresentations in its application for Nonowned Auto coverage." Scottsdale agreed to provide TLC with a defense on the claim but reserved the right to withdraw from the defense.

Scottsdale commenced this action against TLC and RLI requesting declaratory relief and rescission of the nonowned vehicle endorsement. At issue is whether the policy with the endorsement for nonowned vehicle liability provided coverage and if so, whether TLC misrepresented material facts enabling Scottsdale to rescind the endorsement. RLI was joined as a party due to its issuance of the $25 million "following form" umbrella liability policy to TLC. TLC counterclaimed for a

---

**1.** The Alabama Supreme Court recently reversed the finding that TLC or its subsidiary was liable. *ATS, Inc. v. Beddingfield,* —— So.2d ——, 2003 WL 1950005 (Ala. Apr. 25, 2003). The appeal before this court continues both because substantial attorneys fees have been incurred in the *Beddingfield* case and because other accidents have occurred. One other claim has been made against TLC, and others may be made in the future. Therefore, the issues raised in the appeal are not moot.

declaration that it was entitled to the coverage that Scottsdale and RLI disavowed. TLC filed third-party claims against appellants Summit, Lopeman, and IBS on the basis that if TLC were denied coverage under the Scottsdale and RLI policies, then Summit, Lopeman and/or IBS negligently breached their duties as agents to procure the insurance coverage TLC sought.

Following the filing of the cross-motions for summary judgment, the district court partially granted Scottsdale and RLI's motion. The district court effectively denied TLC's cross-motions for summary judgment against Scottsdale and RLI. Although the district court held that the nonowned vehicle endorsement, by its plain language, covered TLC's liability for trucking accidents, it went on to conclude that Scottsdale was nevertheless entitled to rescind the endorsement and deny coverage to TLC due to the answers on the supplemental questionnaires. Since the RLI coverage was for liability in excess of the Scottsdale limits, it fared the same as Scottsdale. As a result, TLC was left without coverage from either Scottsdale or RLI. The district court did not reach the breach of contract or the policy reformation claims asserted by Scottsdale or the other claims advanced by RLI. The district court granted IBS summary judgment dismissing it from the litigation and denied Summit and Lopeman's summary judgment motion that they be dismissed. This appeal followed.

## ISSUES

I. Did the district court err by determining that the nonowned vehicle endorsement to the Scottsdale policy covered accidents of TLC's leased truck drivers?

II. Did the district court err by granting Scottsdale/RLI's motion for summary judgment on its claim for rescission of the nonowned auto endorsement?

III. Did the district court err by denying the motion of Summit and Lopeman for summary judgment relieving them from liability to TLC?

## ANALYSIS

These consolidated appeals all originate from either a grant or a denial of summary judgment by the district court. This court asks two questions on an appeal from summary judgment: "(1) whether there are any genuine issues of material fact and (2) whether the lower courts erred in their application of the law." *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990) (citation omitted). A district court can grant a motion for summary judgment

> when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that either party is entitled to a judgment as a matter of law. On appeal, the reviewing court must view the evidence in the light most favorable to the party against whom judgment was granted.

*Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993) (citations omitted).

### I.

■ The first issue is whether the district court erred by determining that the nonowned vehicle endorsement to the Scottsdale/RLI policy insured TLC for accidents of its leased truck drivers. The district court found that coverage for nonowned vehicles was included in the nonowned auto endorsement, which stated

> [t]he insurance provided under COVERAGE A (Section 1) applies to "bodily injury" . . . arising out of the use of any

"nonowned auto" in *your business* by any person other than you.

(Emphasis added.) A nonowned auto was defined in the endorsement as "any 'auto' you do not own, lease, hire, rent, or borrow which is used in connection with your business." Autos are any motor vehicle, including trucks.

We are asked to determine whether the district court erred by determining that the trucks driven by TLC's leased employees were used "in the business" of TLC. Interpretation of an insurance policy is a question of law for the court to decide by looking at the language of the policy. *Iowa Kemper Ins. Co. v. Stone,* 269 N.W.2d 885, 887 (Minn.1978). In making this determination, language is to be given its plain and ordinary meaning. *General Mills, Inc. v. Gold Medal Ins. Co.,* 622 N.W.2d 147, 151 (Minn.App.2001), *review denied* (Minn. Apr. 17, 2001). If the court does find an ambiguity within the policy, the court is to construe that ambiguity in favor of providing coverage to the insured. *See SCSC Corp. v. Allied Mut. Ins. Co.,* 536 N.W.2d 305, 316 (Minn.1995) (noting that ambiguities regarding an insurance company's duty to defend are resolved in favor of the insured).

TLC is known as an employee leasing company. Its primary customers are trucking companies. Its business includes leasing back to trucking companies employees who were initially hired by the trucking company as well as signing up new hires and leasing them to trucking firms that had preselected these drivers. In the Tennessee accident involving Mercer Trucking, Mercer, like other TLC customers, was in the business of moving freight. As part of that business, Mercer has the exclusive ownership of the trucks, the control and direction of the driver, and control over the freight hauled. *See Beddingfield,* —— So.2d at ——, 2003 WL 1950005, at *1 (stating that [TLC]'s leasing contract is "essentially one of form instead of substance" because the contract between TLC and Mercer does not alter the employees' job responsibilities; Mercer still retains primary responsibility for hiring and firing the drivers). Thus, TLC is in the business of leasing employees, and Mercer is in the business of operating trucks to haul freight.

It is possible that both TLC and Mercer could be in the business of operating trucks to haul freight if both companies played some role in the day-to-day business or the control of the drivers. In a joint operation, we would expect to see TLC play an active role in deciding whether a driver should be hired or fired and in supervising that driver; or some presence in the trucking company's operation; or some control over the trucks themselves; or some contact with customers; or some sharing of revenue. Here, none of these conditions exist. The drivers are not operating as part of any blended business.

Although they do not directly bear on the clarity of coverage under the language of the policy, two other considerations bear mention. First, the coverage in the endorsement cost only $300 but had aggregate policy limits of $26 million. TLC wished to cover almost 2,000 truck drivers operating in almost every state in the union. Scottsdale thought it was only covering occasional trips by a few office employees in their own cars for TLC's own business. As Aon told TLC, there was reason to doubt it had coverage. TLC never brought this question up with Scottsdale. The questionnaires that were initially and subsequently completed by RLI indicate that TLC's office locations in Minnesota and Indiana were the material insured locales. This supports the Scottsdale/RLI view.

Second, this coverage was special, supplemental insurance being purchased by a sophisticated business through an insurance brokerage firm. A special policy endorsement was being obtained. Although the endorsement may have been standard language, it was not necessarily nonnegotiable. This is not a contract of adhesion or a consumer policy where the customer has little ability to decipher a complex contract.

Based on the language in the endorsement and the undisputed facts in this case, we conclude that the district court erred by holding that the leased truck drivers were driving in the business of TLC within the meaning of the nonowner auto endorsement and that the Scottsdale/RLI policies covered accidents of those drivers. The plain language of the nonowned auto endorsement limits coverage to TLC's business of employee leasing. TLC is not in the business of hauling freight or operating trucks. Accordingly, we reverse the district court's finding of coverage.

We note that in the underlying negligence litigation, the Alabama Supreme Court held that under the loaned-servant doctrine, TLC was not vicariously liable for the truck driver's negligent and reckless actions. *Beddingfield,* —— So.2d at ——, 2003 WL 1950005, at *4. That court noted that

> the important question is not whether or not [the employee] remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is *acting in the business of* and under the direction of one or the other.

*Id.* (quotations omitted) (emphasis added). According to the Alabama Supreme Court, the driver was acting in the business of the trucking company, not TLC. This is consistent with our conclusion that there is not coverage.

## II.

The second issue is whether the district court erred by granting Scottsdale's motion for summary judgment for rescission. Because we find that TLC's leased drivers were not covered under the vehicle endorsement, we do not address this issue.

## III.

■ The third issue is whether the district court erred by denying summary judgment in favor of Summit and Lopeman. Resolution of this issue rests on the determination of three questions: (1) was there a special relationship between TLC and Summit/Lopeman; (2) did TLC specifically request that Summit/Lopeman obtain insurance coverage for the leased truck drivers, and if so did Summit/Lopeman follow TLC's instructions for the leased employees; and (3) did Summit/Lopeman know, or should they have known, that the supplemental questionnaires were inaccurate or incomplete.

### Special Relationship

■ To determine whether there is a special relationship or special circumstances existing between Summit/Lopeman and TLC, the court must first determine if there is a legal duty running from Summit/Lopeman to TLC. Whether a legal duty exists is a question of law for the court. *Johnson v. Urie,* 405 N.W.2d 887, 891 n. 5 (Minn.1987). But, to determine if there is a legal duty, the court must look at the factual circumstances of the case. *Gabrielson v. Warnemunde,* 443 N.W.2d 540, 543 n. 1 (Minn.1989). If the facts are disputed, the finder of fact is to resolve the disputed facts before the court can determine if a duty exists. *Id.* (citing *Urie,* 405 N.W.2d at 891 n. 5).

■ The legal duty of an insurance agent is to exercise the skill and care that

a reasonably prudent insurance agent would exercise under similar circumstances. *Gabrielson,* 443 N.W.2d at 543. Unless there is a special circumstance or relationship, the agent's duty is to act in good faith and to simply follow the instructions of the insured. *See id.* (noting that "[a]bsent an agreement to the contrary, an agent has no duty beyond what he or she has specifically undertaken to perform for the clients"). But, if there is a special circumstance or relationship or a long-term relationship, the agent knows or should know that the insured is relying on the agent's judgment. *Gabrielson,* 443 N.W.2d at 543–44. Such a relationship exists when the insured asks the agent to examine the insured's exposure and advise the insured on the potential exposure.

Lopeman had worked with TLC prior to Aon evaluating TLC's insurance coverage. Whether this particular ongoing relationship was sufficient to result in a determination that a special relationship existed is a factual question. If a special relationship did exist, its significance is also a question for the trier of fact. Although TLC did not delegate any decision-making authority to Summit/Lopeman, TLC may have relied on Lopeman's advice when Aon questioned whether the Scottsdale endorsement provided the recommended coverage. *See Beauty Craft Supply & Equip. Co. v. State Farm Fire & Cas. Ins. Co.,* 479 N.W.2d 99, 101 (Minn.App.1992) (finding no special relationship without a delegation of decision-making authority and a lack of sophistication on the part of the insured), *review denied* (Minn. Mar. 19, 1992). TLC's officer responsible for insurance decisions stated that he relied on Lopeman and that he believed Lopeman understood more than "any other broker in the country" about their business and the type of insurance coverage they needed. By his own admission, Lopeman strove to convey to his customers that his specialty was transportation companies.

On the other hand, TLC asked for an analysis of its insurance needs from Aon and supplied Aon with a list of its current coverage, including liability limits. This same question was not posed to Summit/Lopeman; Summit/Lopeman was never asked to make a detailed analysis of TLC's insurance needs; and Aon's reports were not provided to Summit/Lopeman. This may indicate TLC's lack of reliance on Summit/Lopeman. We agree with the district court that whether there was a special relationship is question of fact to be determined by the trier of fact.

### Following Instructions

There is conflicting evidence concerning whether TLC instructed Lopeman to secure coverage for the 1,900 drivers. If Lopeman did receive that instruction, and if he knew or should have known that the endorsement did not provide that coverage, then there is a basis for finding that Lopeman failed to follow TLC's instructions regarding the coverage.

There are additional factors for consideration by the finder of fact. TLC claims that its officers spoke with Lopeman at least ten times about the coverage, that Lopeman assured TLC that the endorsement would cover the leased drivers, and that the communications from Lopeman to TLC reassured it of coverage. For example, Lopeman sent a fax transmission explaining that the nonowned vehicle endorsement was priced so low because "the insurance company sees the exposure as TLC's actual office employees and has priced the coverage accordingly." Finally, when Lopeman was specifically asked about TLC's liability if a truck hit a school bus (an example previously supplied by Aon), Lopeman stated that the policy would provide coverage for TLC. We agree with the district court that whether

Lopeman followed instructions is a question for the finder of fact and that summary judgment was appropriately denied.

### Incomplete/Inaccurate Questionnaire

Some states suggest that an insurance agent "does not have [a duty] to assist an applicant in completing [an insurance] application." *Golden Rule Ins. Corp. v. Greenfield,* 786 F.Supp. 914, 916 (D.Colo. 1992); *see also Jackson v. Hartford Life & Annuity Ins. Co.,* 201 F.Supp.2d 506, 511 n. 3 (D.Md.2002) ("Law does not impose a duty on an insurance agent to investigate or verify the answers to an application's questions."). But an agent does have a duty to exercise the skill and care that a reasonably prudent insurance agent would exercise under similar circumstances. *Gabrielson,* 443 N.W.2d at 543. Although whether a general duty exists to provide such assistance is a question of law that is not clear in Minnesota, the facts developed at trial will be important in making that determination in this case. Until the record is fully developed in this regard and findings of fact are made, we cannot address that question. Whether Lopeman had a duty to know about the questionnaire, direct the questionnaire to the appropriate person at TLC, review the questionnaire when it was returned to Summit, or discuss TLC's answers with TLC before forwarding the form to Scottsdale are all questions for the finder of fact. We agree with the district court that given these questions, denial of summary judgment was proper.

### IV.

Although Scottsdale and RLI have argued for reformation of the insurance policy, we do not reach this issue because of our determination that TLC's leased drivers were not covered under the vehicle endorsement.

### DECISION

Because TLC's leased truck drivers do not drive trucks in furtherance of TLC's business, we reverse the district court's determination that the nonowned auto endorsement in Scottsdale's policy provided liability coverage for TLC's leased truck drivers. Because there are material facts to be considered as to whether Summit/Lopeman had a special relationship with TLC, followed TLC's instructions in the acquisition of coverage, or knew or should have known that the supplemental questionnaires were inaccurate or incomplete, we affirm the district court's denial of summary judgment on these issues.

**Affirmed in part, reversed in part, and remanded.**