[No. B209526. Second Dist., Div. One. June 24, 2009.]

ONEBEACON AMERICA INSURANCE COMPANY, Plaintiff and Appellant, v.
FIREMAN'S FUND INSURANCE COMPANY et al., Defendants and Respondents.

184

**COUNSEL**

Musick, Peeler & Garrett, Susan J. Field, Jennifer M. Kokes and David H. Oken for Plaintiff and Appellant.

Tressler, Soderstrom, Maloney & Priess, Paul S. White, Dana H. Sheridan and Jeanne S. Kuo for Defendants and Respondents Fireman's Fund Insurance Company and National Surety Corporation.

Byron & Edwards, Michael M. Edwards and Joyce R. Dondanville for Defendant and Respondent Insurance Company of the West.

**OPINION**

**MALLANO, P. J.**—This case presents the issue of the notice required to trigger a claim for equitable contribution for defense costs brought by an insurer against other insurers of common insureds. OneBeacon America Insurance Company (OneBeacon), Fireman's Fund Insurance Company (FFIC), and Insurance Company of the West (ICW) are primary coinsurers

under liability insurance policies of common insureds who were sued in 1998 for damages and other relief arising out of the insureds' alleged contamination of real property. OneBeacon undertook the defense of the insureds and began paying defense costs in 1999, but FFIC and ICW agreed to share the defense costs incurred only after certain dates in 2002.

OneBeacon sued FFIC and ICW for declaratory relief under an equitable contribution theory, alleging that FFIC and ICW received adequate notice or were tendered the defense of the underlying action in 1999 and were thus obligated to share in the defense costs incurred from 1999 to 2002. Finding defects as to notice and tender, the trial court concluded that OneBeacon was not entitled to equitable contribution from FFIC and ICW before various dates in 2002.

As explained below, based on *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1 [221 Cal.Rptr. 171] (*California Shoppers*) and our decision in *Truck Ins. Exchange v. Unigard Ins. Co.* (2000) 79 Cal.App.4th 966 [94 Cal.Rptr.2d 516] (*Unigard*), we hold that an insurer's obligation of equitable contribution for defense costs arises where, after notice of litigation, a diligent inquiry by the insurer would reveal the potential exposure to a claim for equitable contribution, thus providing the insurer with the opportunity for investigation and participation in the defense in the underlying litigation. Here, had ICW and FFIC "diligently pursued the requisite inquiry" (*California Shoppers*, at p. 37), they would have discovered their potential exposure to OneBeacon's claims for equitable contribution in 1999, thus providing them with the opportunity for investigation and participation in the defense in the underlying action. Accordingly, OneBeacon is entitled to equitable contribution from FFIC and ICW starting in 1999.

## BACKGROUND

From 1955 to 1998, Mouren-Laurens Oil Company (MLOC) operated an oil refining and recycling business on real property in Compton. In 1998, REV 973 LLC purchased the Compton property at a nonjudicial foreclosure sale and brought suit, later removed to federal court, alleging that the property was contaminated with petroleum products. (*REV 973 LLC v. Mouren-Laurens Oil Co.* (U.S. Dist. Ct., C.D.Cal., No. 98-CV-10690-AHM (Ex)) (REV 973 action).)[1] REV 973 LLC sought cleanup costs, injunctive relief, and damages. The defendants named in the REV 973 action included MLOC; John Mouren-Laurens (John) and his wife, Mireille Mouren-Laurens (Mireille); John as administrator of the estate of Joseph Mouren-Laurens, Sr. (Estate); and Emma Mouren-Laurens (Emma), the surviving spouse of

---

[1] The REV 973 action is still pending.

Joseph Mouren-Laurens, Sr. (Joseph Sr.). In the REV 973 action, the second amended complaint, filed in December 1998, the third amended complaint, filed in March 1999, and the fourth amended complaint, filed in April 2000, each alleged that the defendants were "the partners, joint venturers, agents, employees, fiduciaries, servants and successors" of each of the other defendants. The fifth amended complaint in the REV 973 action, filed in June 2002, alleged that John, Mireille, Joseph Sr., and Emma were legal or equitable owners of MLOC, and directors, officers, or agents of MLOC.

OneBeacon insured MLOC, Estate, Emma, John, and Mireille (sometimes referred to as the Mouren-Laurens insureds) under general liability insurance policies. In February 1999, OneBeacon began defending them in the REV 973 action under a reservation of rights. FFIC and ICW insured some of the Mouren-Laurens insureds under various policies, discussed in more detail below. In 2002 or 2003, FFIC and ICW agreed, with reservation of rights, to share the defense costs those Mouren-Laurens insureds incurred after certain dates in 2002 but not any defense costs incurred from 1999 through certain dates in 2002.[2]

The basis for ICW's agreement to share the defense costs of Emma and Estate is a primary liability policy, No. ADD271630 (ADD Policy), which was in effect beginning December 6, 1977. ICW agreed, for purposes of this action, that it has a duty to defend Emma and Estate under the ADD Policy.

The basis for FFIC's agreement to share the defense costs of MLOC, Emma, and Estate is FFIC's commercial liability and automobile policy, No. LA0232-37-30 issued to MLOC (MLOC Policy), which afforded coverage from September 29, 1975, to September 29, 1978.

In October 2005, OneBeacon filed the instant action for equitable contribution against FFIC and ICW. OneBeacon alleged that between February and April 1999, the defense of the REV 973 action was tendered to ICW by one or more of the Mouren-Laurens insureds, and in June 1999, the defense of the REV 973 action was tendered to FFIC by one or more of the Mouren-Laurens insureds. Based on an application of a "time-on-the-risk" allocation formula for defense costs agreed to by the parties, OneBeacon alleged that FFIC owed it approximately $800,000 and ICW owed it approximately $140,000 for defense costs for the period from 1999 to September 30, 2002.

The parties asked the trial court to determine when OneBeacon was entitled to contribution for defense costs incurred in the REV 973 action from

---

[2] In March 2002, FFIC agreed to share defense costs of MLOC; in April 2003, FFIC agreed to share defense costs of Emma; and in July 2003, FFIC agreed to share defense costs of Estate. In June 2002, ICW agreed to share defense costs of Estate, and in August 2002, ICW agreed to share defense costs of Emma.

ICW (with respect to Estate and Emma) and from FFIC (with respect to MLOC, Emma, and Estate). The matter was tried to the court on the following documents and stipulations of facts.

A. *ICW*

1. *Evidence of ADD Policy*

The following ICW documents reveal the existence of the ADD Policy:

a. A declarations page from an ICW commercial umbrella liability policy, No. UC-361178, for the period December 6, 1977, to December 6, 1978, listing the named insured as Joseph Sr. and the ADD Policy as an underlying liability policy.

b. A declarations page from an ICW commercial umbrella policy, No. UC-361806, for the period December 6, 1978, to December 6, 1979, listing the named insured as Joseph Sr. and the ADD Policy as an underlying liability policy. A handwritten note on the declarations page stated that MLOC was added to the policy effective December 6, 1979.

c. A declarations page from the ADD Policy itself which lists the limits of liability for various coverages and the addresses of the Compton properties.

d. Six pages of undated computer printouts from ICW's computer listing the ADD Policy for the policy periods beginning on December 6, 1977, and ending on December 6, 1980. The insured is listed as Joseph Sr.

e. An undated printout of ICW policies "per PMS/Goodsay" listing various policies issued to MLOC and Joseph Sr. between 1976 and 1980. The ADD Policy is listed under Joseph Sr.'s name with effective dates of December 6, 1977, to December 6, 1980.

2. *Evidence of Emma As an Additional Insured*

A declarations page shows that ICW issued an umbrella policy, No. UC-363192, for the period May 1, 1979, to May 1, 1980. MLOC is listed as the insured with an underlying OneBeacon comprehensive general liability policy. Another ICW document, an endorsement, shows that in 1979, "Joseph Mouren-Laurens Sr. & Emma Mouren-Laurens" were added as additional insureds on policy No. UC-363192.

3. *Insureds' Discovery of Existence of ADD Policy*

By letter of February 26, 1999, James Artiano, the attorney for Estate, wrote to ICW in pertinent part that Joseph Sr. "was an insured under [three

ICW umbrella policies] as well as [a policy issued by the predecessor to OneBeacon]. [¶] I have enclosed a copy of the Second Amended Complaint which has been served on the Estate regarding claims that have been made against [Joseph Sr.] It is requested that your company provide indemnification and defense to [Estate] in this matter. Currently, [OneBeacon] has agreed to participate in the defense of the Estate under a reservation of rights." The letter included the policy numbers of three ICW umbrella policies, No. UC-363192 (as to which Emma was an additional insured), No. UC-365599, and No. UC-363749. The letter stated that enclosures accompanied the letter.

On March 25, 1999, Artiano sent another letter to ICW, which repeated the information conveyed in February 1999 and also indicated that the second amended complaint in the REV 973 action was enclosed with the letter. On April 6, 1999, ICW, by its senior claims analyst Charles Coune, sent a letter to Artiano acknowledging receipt of the March 25, 1999 letter, stating that REV 973 LLC's second amended complaint was not enclosed, and requesting a copy of the complaint. ICW's letter listed the insured as MLOC. ICW also wrote that "[d]ue to the age of the policies, it may take some time to retrieve them. If you have the declarations page, or any portions of these policies, we would likewise appreciate receiving a copy."

Artiano replied to ICW on April 12, 1999, stating that enclosed was a copy of the recently filed third amended complaint in the REV 973 action and "copies of documents in our possession that make reference to your policies. These are not declaration pages, but are part of the declaration pages of [OneBeacon]."

On April 16, 1999, Trutanich • Michel, LLP (Trutanich), the attorney for MLOC, John, and Mireille, sent a letter tendering the defense of the REV 973 action to ICW. The letter identified the REV 973 action by title, court, and case number and also referred to one of ICW's umbrella policies, No. UC-363192. The insureds asked that ICW "locate and provide us with a copy of the subject policy and any related policies you locate." On June 4, 1999, Trutanich sent a followup letter to ICW, stating that ICW had not yet responded to the tender of defense by MLOC, John, and Mireille.

On June 9, 1999, Artiano wrote a letter to Coune at ICW, inquiring about ICW's position on the "commencement of defense and indemnification by [ICW] for [Estate] and [MLOC]."

Coune, on behalf of ICW, replied to Artiano on June 18, 1999, that as an umbrella carrier, ICW "has no obligation to participate in the defense, particularly when one is being provided, whether under reservation of rights or not, by [OneBeacon]." Coune also wrote that he had reviewed the

pleadings in the REV 973 action and that such review led him to conclude that REV 973 LLC's claims were subject to unspecified policy exclusions. Notwithstanding ICW's denial of any obligation to participate in the defense, ICW stated that it continued to monitor the REV 973 action. On June 18, 1999, Coune also replied to Trutanich that ICW was not going to participate in the defense of MLOC at that time.

On July 21, 1999, Trutanich wrote to Coune that Trutanich had discovered documents "which prove that the Insureds [MLOC, John, and Mireille] maintained the referenced additional insurance policies [Nos. UC-365599 and UC-363749] during 1981–1983. . . . We have reason to believe that the coverages under these policies apply to the above-referenced lawsuit, thereby triggering on the part of [ICW] a duty to defend and indemnify the Insureds in connection with said action. Accordingly, on behalf of the Insureds we hereby tender the claims asserted against the Insureds in the referenced action under the stated policies." The letter also asked ICW to "locate and provide us with a copy of the subject policies and any related policies."

On February 7, 2000, Coune wrote to Estate's attorney, Lynette Klawon, that ICW was "passively monitoring the [REV 973 action] in its capacity as an umbrella carrier . . . ." ICW also asked for information on the status of the REV 973 action. On March 3, 2000, ICW sent a letter to Trutanich, setting out the policy limits of several of its umbrella policies and a list of the named insureds, which included MLOC, Emma, John, and Joseph Sr. ICW also informed Trutanich that ICW was "not providing a defense to your client [MLOC] until such time as all primary policy limits have been exhausted." In August 2001, ICW wrote to Trutanich, again declining to participate in the defense of MLOC and noting that each of three umbrella policies issued to MLOC contained a pollution exclusion.

On January 16, 2002, Trutanich wrote to ICW, reminding it that in prior correspondence MLOC, John, and Mireille had written to ICW asking it to disclose all policies of insurance in ICW's possession. According to Trutanich, ICW "chose to deny the existence of other policies and denied coverage. In addition you refused to afford your insureds a defense. [¶] . . . Recently, after relentless investigation, we were able to obtain copies of a number of ICW policies that you failed to disclose. We obtained these copies from your agent William Robinson under threat of proceedings. I have, of course, enclosed them for your perusal though I am confident that you have ready access to these policies. Several of the policies including UC-361806 and UC-361192 have primary underlying coverage with ICW including [the ADD Policy] . . . ."

Emma's attorney in the REV 973 action, Timothy Cronin, by letter dated January 31, 2002, tendered her defense to ICW under 14 policies issued by

ICW from 1976 through 1982, including the ADD Policy. Cronin also wrote that "as a matter of custom and practice [Emma] was added as an additional insured under most, if not all of the policies purchased by MLOC, Joseph Mouren-Laurens, Sr. and/or John Mouren-Laurens. To be certain, while a review of ICW policy number UC-363192 does not disclose [Emma] as an insured on its face, endorsement number 2 to the policy does indeed confirm her status as an additional insured." With respect to the alleged excess nature of some of the ICW policies, Cronin stated that "many of the 'underlying' carriers are now defunct, dissolved or have simply ceased doing business altogether. For example, to the extent that ICW policy number UC-361806 may have been excess to any Reliance policy for the same time period, such is not the case given that Reliance is now in liquidation. As such, ICW's obligation is now primary and its duties to defend and/or indemnify [Emma] in this litigation have been triggered." In addition, "policy number UC-357443, naming [Emma] as an insured, provides for minimal underlying limits for property damage sufficient to trigger ICW's duty to defend in this case. Contrary to ICW's earlier attempts to disclaim coverage, policy number UC-357443 does, indeed, exist and is not excess in nature."

ICW's attorney responded to Cronin on March 26, 2002, that, although ICW still did not have the 14 policies, ICW determined that Emma was an insured on two umbrella policies on Cronin's list, as well as another umbrella policy not on the list; however, ICW was "unable to verify that [Emma] was an insured on any of the other twelve policies you have listed . . . . If you have information indicating your client was an insured on any policy other than those [three umbrella policies], we would be pleased to review it upon your submitting same. Unfortunately, ICW is currently not able to locate the full textual provisions of any of the policies under which your client is apparently tendering, given the passage of time, however, with respect to the three policies as to which your client appears to have been an insured, ICW has been able to determine that they contained, inter alia, the following policy provisions . . . ."

On May 6, 2002, ICW's attorney again wrote to Cronin, "I would like to schedule a time to review in your office whatever coverage materials you have in your files that you believe establish coverage for your client, [Emma]. Some of the documents you sent are not ICW policy forms. I have no evidence that your client was ever added as a named insured on the [ADD Policy]. I do show that [Emma] was added to an ICW umbrella policy, wherein [OneBeacon] was the underlying [comprehensive general liability] carrier." ICW's attorney concluded by again requesting Cronin's "assistance in reviewing file materials, documents or whatever other materials you contend may demonstrate current coverage rights for [Emma] under some ICW policy."

On May 24, 2002, Estate's attorney, Artiano, wrote to Coune at ICW, "Now we have evidence that your company also issued [the ADD Policy] to [Joseph Sr.], which is a primary comprehensive general liability policy. I believe that you and your company were aware of the existence of this policy, but you failed to disclose this information to our office when we previously tendered this claim for defense and indemnification . . . . It is our belief that there has been coverage since we first tendered this claim in 1999, even though we had not found the policy. [¶] It is our belief that you had an obligation to disclose the existence of the underlying policy when I tendered this claim in 1999."

By letter of June 5, 2002, ICW's attorney responded that ICW accepted Estate's tender of defense under the ADD Policy, with a reservation of rights. ICW's attorney also denied that ICW failed to disclose information to Artiano.

But ICW continued to refuse Emma's tender of defense until Emma provided ICW with a declaration of William Robinson, the agent who sold the ADD Policy to Emma and Joseph Sr. In a July 2003 declaration, Robinson declared that he was Emma's insurance "broker-agent" from 1972 to 1995 and Joseph Sr.'s broker-agent from 1972 until his death in 1983; in 1978, he brokered ICW's sale of the ADD Policy to Emma and Joseph Sr.; the ADD Policy's effective dates were from December 6, 1978, to December 6, 1979. Robinson further declared that he did not have a complete copy of the ADD Policy, but the declarations page from an ICW umbrella policy and his typed notes made in 1978 memorialize its existence and issuance. His typed notes indicate that Emma was a named insured, and Emma would have been deemed a named insured under the ADD Policy's spouse provision, as well as under the spouse provision endorsement of the umbrella policy. Robinson specifically recalled that the ADD Policy provided coverage for liabilities arising out of Emma and Joseph Sr.'s ownership of the real property occupied by MLOC, a family-owned business.

ICW, by letter dated August 5, 2003, agreed to defend Emma under the ADD Policy (with a reservation of rights) from the date it received Robinson's declaration, July 11, 2003.

B. *FFIC*

1. *Notice of the REV 973 Action*

The parties stipulated that until 2002, OneBeacon itself was not aware that FFIC was a possible insurer of MLOC, Emma, and Estate. But the following 1999 correspondence between FFIC and the attorneys for Joseph Mouren-Laurens, Jr. (Joseph Jr.) (a defendant in the REV 973 action who was later

dismissed), shows that FFIC learned in June 1999 about the REV 973 action and that MLOC, Emma, and Estate were defendants in that action.

On April 3, 1999, Maya Hamburger, an attorney for Joseph Jr., wrote a letter to FFIC's general counsel stating that Joseph Jr. was the secretary-treasurer of MLOC from 1962 until he left MLOC in 1977, that FFIC was MLOC's insurer beginning in 1959, and that because of "current litigation brought against [Joseph Jr.], it is essential for him to get copies of all documents relating to any policy written by [FFIC] benefitting [MLOC] during the period of 1959 and 1977." The letter also informed FFIC that Leon Elster, FFIC's agent, handled MLOC's insurance policies with FFIC and that Elster sold his company to Harvey Schwartzman, also an FFIC agent.

On April 19, 1999, a paralegal for FFIC replied that in order for it to respond to the request, Joseph Jr. would need to provide an authorization for release of records. Joseph Jr.'s attorney sent a letter to FFIC's paralegal on April 22, 1999, enclosing the release, asking whether FFIC insured MLOC at any time before or after 1962, and requesting copies of any policies issued to MLOC or Joseph Sr.

On June 2, 1999, a claim file note by FFIC employee Colleen Yudin-Cowan stated: "New loss for [MLOC] who claims to be an insured of ours. They are claiming coverage from 1959 to 1977. I checked Atlas policies and couldn't find a policy number. The site is Compton, Ca." The claim file note also stated: "Rev vs. Mouren Lauren vs. Leach Oil."

Arthur Fine, another attorney representing Joseph Jr. in the REV 973 action, sent a letter dated June 3, 1999, to FFIC, requesting defense and indemnification of Joseph Jr. and purportedly enclosing copies of the third amended complaint and the pleadings in two cross-actions in the REV 973 action. The letter contained the title, court and case number of the REV 973 action and informed FFIC that MLOC also was a defendant and cross-complainant in that action, that "it is believed that [MLOC] obtained from [FFIC] comprehensive general liability insurance . . . from 1959 before [MLOC] was even incorporated [in 1962] until possibly as late as 1977," and that Joseph Jr. should have been named as an additional insured under those policies.

By letters dated June 11, 1999, FFIC responded to Joseph Jr.'s attorneys, Hamburger and Fine, that FFIC "has performed a diligent search of its records but has been unable to locate any record of [FFIC's] policies issued to [MLOC]. Accordingly, [FFIC] is unable to evaluate what coverage, if any, is available to [MLOC] under the alleged policies. If you are in possession of

any evidence of the alleged policies please forward same to my attention. Barring contact from your office, [FFIC] will close its file regarding this matter in 60 days." FFIC also wrote that it reserved its rights in the matter and that it was not waiving "any rights and defenses available to [FFIC] under any policy(ies) of insurance which may have been issued to [MLOC]."

The parties stipulated that FFIC "has stated that even if letters identical to the 1999 Maya Hamburger and/or 1999 Arthur Fine letters had been sent by counsel for MLOC or the other named defendant-insureds, the same denial would have been issued."

In August 1999, FFIC closed its files for the Mouren-Laurens insureds but reopened them in 2002.

### 2. Insureds' Contact with FFIC's Agent in 2002

On January 16, 2002, Trutanich sent a letter to FFIC, giving notice of the REV 973 action and requesting the defense of MLOC, John, and Mireille based on the attached declaration of Leon Elster, FFIC's agent from 1948 through 1962. Elster declared that from 1948 through 1962, as FFIC's registered agent, he handled the purchase of FFIC comprehensive general liability policies and personal insurance policies for MLOC and Joseph Sr. In each of the years from 1948 through 1962, the policies issued by FFIC to MLOC and Joseph Sr. were standard form comprehensive general liability policies without unusual or special limits or terms. Elster sold his company in January 1963 and did not retain any files.

A January 31, 2002 letter from Cronin on behalf of Emma requested that FFIC undertake her defense and indemnification.

### 3. FFIC's Discovery of Existence of MLOC Policy by March 11, 2002

On March 11, 2002, FFIC wrote to Trutanich that, in response to Elster's declaration, FFIC undertook an "exhaustive search of its records and data-bases for evidence of the policies which Mr. Elster alleges were issued by [FFIC]. As a result of this search, [FFIC] has been unable to locate evidence of any insurance policy issued to MLOC, [John] or [Mireille] *which was issued during the period of time set forth in Mr. Elster's declaration.*" But in searching for the policies referred to in Mr. Elster's declaration, FFIC found evidence (a record of a premium payment) showing that MLOC had a commercial liability and automobile policy, No. LA0232-37-30 (the MLOC Policy), which afforded liability coverage to MLOC from September 1975 to

September 1978. Although FFIC had not located a copy of the actual policy, it had located sample forms, which were likely incorporated into the MLOC Policy. FFIC agreed to defend MLOC under a reservation of rights and eventually reimbursed OneBeacon for FFIC's share of the defense costs incurred on and after January 16, 2002.

In April 2003, FFIC agreed to defend Emma as of January 31, 2002, under a reservation of rights, noting that Emma's attorney first tendered her defense to FFIC in a letter dated January 31, 2002.

Estate's attorney, Artiano, sent a letter to FFIC on June 21, 2002, demanding Estate's defense and indemnification in the REV 973 action based on Elster's declaration. Thereafter, FFIC agreed to provide a defense to Estate under a reservation of rights.

### 4. FFIC's Explanation of 2002 Discovery of Existence of MLOC Policy

FFIC's claims specialist Jeffrey Hayes executed a declaration in 2006 stating that in 2002 he had reviewed FFIC's files "from 1999 pertaining to certain communications from and to [FFIC] regarding a claim for insurance coverage by [Joseph Jr.]" Although Hayes did not assert that he was involved in handling the Mouren-Laurens matters in 1999, Hayes declared that, in response to Fine's June 3, 1999 letter, "[FFIC] again conducted a search for policies of insurance that may have afforded coverage to [Joseph Jr.] According to the records that I have reviewed concerning [FFIC's] search in 1999, [FFIC] had attempted to contact the producer (or broker), but was advised that copies of the alleged policies had not been maintained. [FFIC] also searched the relevant [FFIC] branch office, but determined that no policy information existed. [FFIC] searched its archive claim lists, insured book, survey book, premium payments records, branch office, and producer, but was unable to locate any information. [FFIC] searched for any policies of insurance based on the identification of agents that was provided to it, but [FFIC] located no correspondence or other documents."

In his deposition, Hayes testified that when he reviewed FFIC's claims file in 2002, he did not find a copy of the third amended complaint in the REV 973 action, purportedly attached to Fine's June 3, 1999 letter. But Hayes's declaration stated that in Fine's June 3, 1999 letter, "Mr. Fine advised that his firm is 'litigation counsel for [Joseph Jr.]' who was named as a defendant in an amended pleading (which Mr. Fine enclosed) filed in the [REV 973] action."

Hayes explained FFIC's March 2002 discovery of the existence of the MLOC Policy and FFIC's failure to discover it in 1999 as follows: "By 2002, [FFIC] had adopted and instigated measures to search for policies of insurance issued to its insureds that were not available in 1999. In 1999, [FFIC's] basic retrieval system was limited to searching for missing policies (i.e. policies allegedly issued by it which cannot be located by [FFIC], the insured, or any other person) by policy number only. While [FFIC], when searching for missing policies, will examine its archives and other evidence that premiums were received or claims were paid, the absence of any identified policy number, as of 1999, was a serious and often fatal impediment to locating any missing policies. By 2002, however, [FFIC] had updated its retrieval system, and had the capacity at that time to search for lost policies by keying in the insured's name. . . . [¶] In 2002, using the information supplied by [MLOC's attorney], including the declaration of Leon Elster, and applying its new search capabilities, [FFIC] located evidence that premium payments had been made on a commercial liability policy [the MLOC Policy], which may have afforded liability coverage to MLOC for the period of time from 9/29/75 to 9/29/78. Despite locating evidence that the policy existed, . . . [FFIC] had not located any copy of the alleged policy."

Hayes further declared that the alleged policy would likely have incorporated a "specimen form," and based on that specimen form, FFIC sent its March 11, 2002 letter agreeing to defend MLOC in the REV 973 action.

## C. *Trial Court's Ruling*

After a hearing on the stipulated facts and documents, the trial court issued its order on OneBeacon's right to equitable contribution. As set out in the subsequent May 2008 judgment, the court determined (1) that OneBeacon was entitled to contribution from ICW for the defense costs of Emma and Estate beginning on May 24, 2002, and (2) OneBeacon was entitled to contribution from FFIC for MLOC beginning on January 16, 2002, for Emma beginning on January 31, 2002, and for Estate beginning on June 21, 2002.

As to ICW, the court's order stated that OneBeacon was entitled to contribution on the date that "ICW was first notified there was some evidence it had issued a primary policy to [Joseph Sr.] . . . Emma gave ICW notice of her claim to a defense on January 31, 2002, but ICW had no record and was shown no record until May 24, 2002, indicating that the ADD [P]olicy cited by Emma in January had been issued to [Joseph Sr.]" As to Estate, the trial court acknowledged that it had tendered a defense to ICW in February 1999 but found that ICW did not know of its primary ADD Policy until 2002. The court reasoned that "[n]o one has shown that a thorough search by ICW of its

records at any time would have revealed evidence of a primary policy issued to [Joseph Sr.], and no one contends that ICW knew actually or constructively before 2002 that it had issued such a policy. Moreover, the court is unaware of any authority that would hold ICW to have breached a duty to defend the Estate before it had actual or constructive notice of a policy providing a defense, or, to defend Emma before it had actual or constructive notice that Emma was seeking a defense. [¶] ICW is not shown to have breached a duty to have inquired further of its insureds or, to have searched its records more thoroughly. The court concludes that [ICW did not] have notice from 1999 to May 24, 2002, that it would be responsible to contribute to the Estate's defense . . . ."

With respect to OneBeacon's entitlement to contribution from FFIC, the trial court explained its ruling as follows: "[T]he April 3 and June 3, 1999 letters, read together say [Joseph Jr.] is inquiring and is asking for defense and indemnity under any FFIC policies issued to MLOC. Despite the loose read evidenced by the claims person's [Colleen Yudin-Cowan's] June 2[, 1999] note, it cannot be said that further inquiry by FFIC to its 1999 correspondents would have caused it to discover that any insureds other than [Joseph Jr.] had made the request for a defense. What might have happened in 1999 had FFIC conducted an appropriate search and found evidence of the policy it issued to MLOC, and so advised [Joseph Jr.], can only be imagined. Both sides advised the court at oral argument that [Joseph Jr.] was dismissed from the [REV 973 action]. Would he, with knowledge in 1999 of an FFIC policy, have then alerted MLOC, Emma, and the Estate, who were being defended by OneBeacon, and would OneBeacon have learned of this? We can all speculate, but FFIC did not breach a duty to [Joseph Jr.] to make further inquiry. That it may have breached a duty to provide him with a defense does not, under the circumstances known here, make FFIC recalcitrant insofar as MLOC, Emma, or the Estate, or unjustly enriched insofar as OneBeacon. [¶] . . . [Joseph Jr.'s] 1999 efforts cannot be said, because of any principle of equity, to redound to MLOC, Emma, and the Estate, or to OneBeacon. The truth that FFIC would have learned in 1999, had it made further inquiry, was what it already knew—that only [Joseph Jr.] was seeking a defense."

OneBeacon appealed from the judgment, contending, among other things, that ICW and FFIC had sufficient actual or constructive notice in 1999 to trigger OneBeacon's rights to equitable contribution.[3]

---

[3] OneBeacon's appellate briefs do not address the judgment in favor of National Surety Corporation, so we deem the appeal to be abandoned as to National Surety. The appeal as to National Surety Corporation is thus dismissed.

## DISCUSSION

### A. *Equitable Contribution*

■ Equitable contribution "is the right to recover, not from the party *primarily* liable for the loss, but from a *co-obligor* who *shares* such liability with the party seeking contribution. In the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others. Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured. Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1293 [77 Cal.Rptr.2d 296], fn. omitted (*Fireman's Fund*).)

■ "This right of equitable contribution belongs to each insurer individually. It is not based on any right of subrogation to the rights of the insured, and is not equivalent to ' "standing in the shoes" ' of the insured." (*Fireman's Fund, supra,* 65 Cal.App.4th at p. 1294.) Further, as these principles do not stem from any contract between the insurers, the right of equitable contribution is not controlled by the language of their policies with their insureds. (*Id.* at pp. 1306–1307.) Nevertheless, "absent compelling equitable reasons, courts should not impose an obligation on an insurer that contravenes a provision in its insurance policy." (*Unigard, supra,* 79 Cal.App.4th at p. 974.) "Because equitable considerations vary, our Supreme Court [in *Signal Companies, Inc. v. Harbor Ins. Co.* (1980) 27 Cal.3d 359, 369 [165 Cal.Rptr. 799, 612 P.2d 889],] has declined to formulate a definitive rule for when contribution should be compelled between insurers." (*American Internat. Specialty Lines Ins. Co. v. Continental Casualty Ins. Co.* (2006) 142 Cal.App.4th 1342, 1365 [49 Cal.Rptr.3d 1].) But in determining whether one insurer is entitled to contribution from another, courts should consider the nature of the claim, the relation of the insured to the insurers, the particulars of each policy, and any other equitable considerations. (*Ibid.*)

■ " 'The duty to defend is "a continuing one, arising on *tender of defense* and lasting until the underlying lawsuit is concluded [citation], or until it has been shown that there is no potential for coverage . . . ." ' (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 869 [77 Cal.Rptr.2d 107, 959 P.2d 265] . . . .) Phrased somewhat differently, ' "[t]he duty to defend arises when the insured *tenders defense* of the third party lawsuit to the insurer." ' [Citation.] The 'temporal limits of the insurer's duty to defend [fall] between tender of the defense and conclusion of the action.' [Citation.]" (*Unigard, supra,* 79 Cal.App.4th at p. 976; see also *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 61 [70 Cal.Rptr.2d 118, 948 P.2d 909] (*Aerojet-General*) [temporal duty to defend insured runs from tender of defense to conclusion of action against insured].)

"Tender can be either formal or constructive. [Citations.]" (*Unigard, supra,* 79 Cal.App.4th at p. 979, fn. 16.) Thus, although the duty to defend ordinarily arises after receipt of an actual tender of defense, it may arise upon receipt of "constructive notice" of the contractual duty to defend. (*California Shoppers, supra,* 175 Cal.App.3d at p. 37.) In *California Shoppers*, an action by an insured against its insurer for breach of the contractual duty to defend, the insurer was held to have had constructive notice of tender of the defense when the insured sent to the insurer a copy of the summons and complaint naming the insured as a defendant, notwithstanding an envelope with the return name and address of another entity, also an insured under another policy but not named in the enclosed complaint, and the lack of a cover letter. The court concluded that, had the insurer made diligent inquiry, it would have concluded that tender came from the insured and not the other entity. The court summed up: "In other words, given the appropriate circumstances, the law will charge a party with notice of all those facts which he might have ascertained had he diligently pursued the requisite inquiry." (*Ibid.*)

■ The concept of constructive notice was also developed in *Unigard*, an equitable contribution action between coinsurers. In *Unigard*, the defendant, Unigard Insurance Company, did not participate in the underlying litigation due to a lack of tender by its insured. The plaintiff, Truck Insurance Exchange, gave notice to Unigard of its potential liability for equitable contribution only *after* the underlying litigation was resolved. The question presented was "*when* does an insurer that is providing a defense have to raise the issue of contribution with potential coinsurers that are not participating in the litigation due to a lack of tender." (*Unigard, supra,* 79 Cal.App.4th at pp. 978–979.) We rejected Truck's argument that, regardless of when it learned the identity of potential coinsurers, notice to potential coinsurers was not necessary until the underlying action had concluded. We determined that

notice should be given sooner, rather than later. (*Id.* at p. 979.) "Under these circumstances, the imposition of contribution on Unigard—a stranger to the litigation—would subject it to a significant financial burden even though it did not enjoy any of the concomitant benefits, e.g., the right to participate in and control the defense. Truck decided to investigate and settle the [underlying litigation] without Unigard's involvement. Having done so, Truck should not be permitted to drag Unigard into the picture after the fact. [¶] . . . With prompt notice, the coinsurer can investigate the matter and decide whether to join in the defense. If, however, notice is given *after* the underlying litigation is over, the matter is more likely to end up in court." (*Id.* at pp. 979–980.)

In *Unigard* we thus concluded that "[t]he notice should have been made promptly after Truck agreed to provide a defense. That is not to say that Truck had to tender the defense to Unigard. A simple notice regarding the possibility of contribution would have been sufficient." (*Unigard, supra,* 79 Cal.App.4th at p. 982.)

*Unigard* acknowledges that an *insured's* lack of tender or compliance with a policy provision is not fatal to a coinsurer's right of equitable contribution; rather, adequate notice of the potential for contribution and the opportunity for investigation and participation in the defense in the underlying litigation will suffice.

*Unigard*'s rule of constructive notice is consistent with the rule that has been adopted by the state supreme courts in Minnesota, New Hampshire, Wisconsin, and Illinois, as well as intermediate appellate courts in Pennsylvania and Louisiana. As explained by the Supreme Court of Minnesota in *Home Ins. Co. v. National Union Fire Ins.* (Minn. 2003) 658 N.W.2d 522 (*Home Ins.*), a case by one insurer against other insurers for reimbursement of defense costs or contribution: "While there are relatively few state supreme courts that have directly addressed the issue [of what constitutes sufficient notice in a case for reimbursement or contribution], of the three state supreme courts that have, all have ruled that notice of suit is sufficient to tender a defense. In 1998, the Illinois Supreme Court held that an insured's notice to the insurer of the lawsuit was enough to constitute tender. *Cincinnati Cos. v. West Am. Ins. Co.,* 183 Ill.2d 317, 233 Ill.Dec. 649, 701 N.E.2d 499, 504 (1998) (holding 'the better rule is one which allows actual notice of a claim to trigger the insurer's duty to defend, irrespective of the level of the insured's sophistication, except where the insured has knowingly forgone the insurer's assistance'). New Hampshire and Wisconsin have also determined that putting an insurer on notice of a claim constitutes tender. *White Mountain Constr. Co. v. Transamerica Ins. Co.,* 137 N.H. 478, 631 A.2d 907, 910 (1993) (holding that

'in order for an insured to tender the defense to the insurer, it need only put the insurer on notice of the claim'); *Towne Realty, Inc. v. Zurich Ins. Co.*, 201 Wis.2d 260, 548 N.W.2d 64, 67 (1996) (holding that '[a] tender of defense occurs once an insure[r] has been put on notice of a claim against the insured')." (*Home Ins., supra*, 658 N.W.2d at p. 532, fn. omitted.)

"Intermediate courts in Louisiana and Pennsylvania appear to have reached the same result. See *Cobb v. Empire Fire & Marine Ins. Co.*, 488 So.2d 349, 350 (La.Ct.App. 1986); *Widener Univ. v. Fred S. James & Co.*, 371 Pa.Super. 79, 537 A.2d 829, 833 (1988)." (*Home Ins., supra*, 658 N.W.2d at p. 532, fn. 5.)

The court in *Home Ins.* reasoned that "sound public policy does not support a rule that requires insureds to expressly request a defense in order to trigger the duty to defend. Three broad reasons support defining 'tender' as giving the insurer notice and opportunity to defend a covered lawsuit: first, it clarifies the duties of the parties early in the litigation; second, it acknowledges the greater knowledge and sophistication of the insurer; and third, it places no significant burden on insurers." (*Home Ins., supra*, 658 N.W.2d at p. 532.) "Once notice is given, even without an express request for a defense, it should be the responsibility of the insurer to contact the insured to determine whether the insurer's assistance in the suit is required. The burden we are placing on the insurer with this rule is not onerous, as the Illinois and Wisconsin courts have noted. [Citations.] When notified of the insured's potential liability under the suit, the insurer 'can simply ask the insured if the insurer's involvement is desired, thus eliminating any uncertainty on the question.' [Citation.] While in [*SCSC Corp. v. Allied Mut. Ins. Co.* (Minn. 1995) 536 N.W.2d 305, 316–317], we wanted to make sure that insurers could not be saddled with defense costs over which they had no control, this is not a concern here. The 'notice and opportunity to defend' rule we adopt ensures insurers will not be surprised when defense costs are foisted on them." (*Home Ins., supra*, 658 N.W.2d at pp. 533–534.)

The court in *Home Ins.* further explained the benefits of defining tender as notice of a lawsuit and the opportunity to defend: "By disallowing the formation of a potential loophole for insurers around what constitutes an express request for defense, we clarify the duties of insurers and protect the bargain struck by the parties in the insurance policy. The insured paid for the insurer's promise to defend the insured for covered claims, and the insured's ignorance regarding the language the insured must use to invoke that coverage should not negate the bargain. [Citations.] [¶] . . . [¶] . . . We will not create a legal rule that presumes an insured, whether a company or an individual, is equally sophisticated, knowing its contractual right to coverage

and when and how to invoke it. Nor will we create a rule that 'interpret[s] an insured's silence as a statement of intent to forgo the insurer's assistance.' [Citation.] Indeed, insurers are better able to 'facilitate clear communication between the parties.' [Citations.]" (*Home Ins., supra*, 658 N.W.2d at p. 533.)

Accordingly, *Home Ins.* held that "once an insured provides its primary or umbrella insurer with notice of a suit and opportunity to defend, it has tendered the defense as required by [*SCSC Corp. v. Allied Mut. Ins. Co., supra*, 536 N.W.2d 305]." (*Home Ins., supra*, 658 N.W.2d at p. 534.) And, as explained in *Cincinnati Companies v. West American, supra*, 701 N.E.2d at page 505 (*Cincinnati Cos.*), the requisite notice is notice sufficient to permit the insurer to locate and defend the lawsuit; and "in order to have actual notice sufficient to locate and defend a suit, the insurer must know both that a cause of action has been filed and that the complaint falls within or potentially within the scope of the coverage of one of its policies."

■ Pursuant to *Unigard* and *California Shoppers*, and the public policies articulated in *Home Ins.* and *Cincinnati Cos.*, we adopt the rule that an insurer's obligation of equitable contribution for defense costs arises where, after notice of litigation, a diligent inquiry by the insurer would reveal the potential exposure to a claim for equitable contribution, thus providing the insurer the opportunity for investigation and participation in the defense in the underlying litigation.

FFIC maintains that California already has "clearly established notice and tender law," which does not comport with the "simple notice" language in *Unigard*. But none of the cases cited by FFIC addresses the issue of notice among coinsurers, as in *Unigard*, or the issue of constructive notice, as in *California Shoppers. Aerojet-General* and *Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra*, 18 Cal.4th 857, were cases brought by insureds against insurers. The former case addressed the issue of whether environmental investigation costs constituted defense costs for which the insurer was liable; the latter case addressed the issue of whether a California Environmental Protection Agency order requiring remediation constituted a "suit" that triggered the insurer's duty to defend under a comprehensive general liability policy. Both cases merely set out the general rule regarding the temporal limits of the duty to defend without discussing the concept of constructive notice. Similarly, *Faust v. The Travelers* (9th Cir. 1995) 55 F.3d 471 was an action between insured and insurer where the court held that under the voluntary payments provision of the policy, the insurer had no obligation to reimburse the insured for pre-tender defense costs. Accordingly, the foregoing cases do not abrogate the principles set out in *Unigard* and *California Shoppers*.

Nor does the foregoing rule of constructive notice applicable to an equitable contribution action contravene a provision in a policy which prohibits an insured from making voluntary payments without the insurer's consent, known as a "no-voluntary-payment provision." Our courts have applied a no-voluntary-payment provision to acts by the insured such as "the making of unapproved expenditures in response to a claim or suit, including the payment of a settlement, attorney fees, litigation costs, repair expenses, and remediation costs." (*Belz v. Clarendon America Ins. Co.* (2007) 158 Cal.App.4th 615, 628 [69 Cal.Rptr.3d 864].) " 'Typically, a breach of that provision occurs, if at all, before the insured has tendered the defense to the insurer.' " (*Id.* at p. 626.) And there are exceptions to the prohibition on voluntary payments, " 'as where the insured is unaware of the identity of the insurer, the payment is necessary for reasons beyond the insured's control, or the insured faces a situation requiring an immediate response to protect its legal interests.' [Citation.] In a circumstance of that nature, the insured's payment is considered *involuntary*." (*Id.* at p. 628.)

In any event, the right of equitable contribution between insurers is not controlled by the contract between the insured and the insurer but by equitable principles (*Fireman's Fund, supra*, 65 Cal.App.4th at pp. 1306–1307), the application of which do not run afoul of the policy provision prohibiting voluntary payments.

## B. *ICW*

As to ICW, the trial court failed to apply the principles of *California Shoppers* and *Unigard* properly when it determined that ICW's obligation of equitable contribution arose on May 24, 2002, rather than on February 26, 1999.

Here, Estate tendered its defense to ICW on February 26, 1999, when ICW received a copy of the second amended complaint in the REV 973 action with the information that OneBeacon was providing a defense to Estate under a reservation of rights. The pleading in the REV 973 action provided ICW with notice of the relationships among the Mouren-Laurens insureds and that Emma was a defendant in that action, as was John as the administrator of Estate.

Numerous ICW documents contained the policy numbers of policies issued to Joseph Sr., including the ADD Policy number. There was also an endorsement to an umbrella policy showing Emma and Joseph Sr. as additional insureds. ICW did not establish that the foregoing documents were not

readily available to it on February 26, 1999, and that had it conducted a diligent inquiry on February 26, 1999, it would not have discovered the existence of the ADD Policy listing Joseph Sr. as an insured, that it was effective from December 6, 1977, to December 6, 1980, and that Estate and Emma were potential insureds under the ADD Policy. In other words, there was no showing that the information available to ICW when it ultimately agreed to share the defense costs of Estate and Emma, in 2002 and 2003 respectively, was different from the information available to it upon a diligent inquiry in February 1999.

ICW's brief asserts that it "conducted a diligent and thorough search for the specific umbrella policies identified, and any other policies that may have provided coverage to the tendering parties for the [REV 973 action]." But the record citations for this proposition—the trial court's order and the correspondence between ICW and the attorneys for Estate and Emma—do not establish a diligent search. Rather, the correspondence shows that ICW did not conduct any search whatsoever, but placed the burden of discovering the ADD Policy on Estate and Emma. Nor did the trial court find that ICW had conducted a diligent inquiry for applicable policies. Rather, the trial court did not acknowledge that ICW had an obligation to conduct a diligent inquiry.[4]

Under *California Shoppers*, ICW is charged with knowledge of all information a diligent inquiry would have revealed. On this record, the only reasonable inference is that a diligent inquiry in February 1999 would have revealed the existence of the ADD Policy and that Estate and Emma were potential insureds under the ADD Policy. Thus, in February 1999, a diligent inquiry would have placed ICW on notice of its potential exposure to the claims of OneBeacon for equitable contribution for the defense costs

---

[4] The trial court's order stated in pertinent part: "ICW monitored the [REV 973 action] from the time it first received notice from the Estate, but it did not do so understanding that it had a primary policy in play. No one knew of such a policy until 2002. No one has shown that a thorough search by ICW of its records at any time would have revealed evidence of a primary policy issued to Joseph Mouren-Laurens, Sr., and no one contends that ICW knew actually or constructively before 2002 that it had issued such a policy. Moreover, the court is unaware of any authority that would hold ICW to have breached a duty to defend the Estate before it had actual or constructive notice of a policy providing a defense, or, to defend Emma before it had actual or constructive notice that Emma was seeking a defense. [¶] ICW is not shown to have breached a duty to have inquired further of its insureds or, to have searched its records more thoroughly. The court concludes that where ICW cannot be said to have had notice from 1999 to May 24, 2002, that it would be responsible to contribute to Estate's defense, there has been no compelling equitable consideration shown by OneBeacon that should require contribution from ICW on behalf of the Estate in contravention of the notice provision in every policy of insurance."

of Estate and Emma. This is sufficient notice under *Unigard* to trigger OneBeacon's right of equitable contribution.

We thus conclude that the trial court's determination that OneBeacon's right of equitable contribution from ICW arose on May 24, 2002, is not supported by substantial evidence. Because the record establishes that, as a matter of law, OneBeacon's right of equitable contribution arose on February 26, 1999, the judgment must be modified as to ICW to provide that OneBeacon is entitled to contribution from ICW for the defense costs of Emma and Estate beginning on February 26, 1999.

## C. *FFIC*

In denying OneBeacon's request for equitable contribution from FFIC beginning in 1999, the trial court reasoned that as a matter of law FFIC's duty of diligent inquiry extended only to Joseph Jr. because only Joseph Jr. had tendered his defense in the REV 973 action to FFIC in 1999. This is merely another way of saying that in 1999 only Joseph Jr. had complied with the notice and tender provisions of the MLOC Policy. But the trial court's ruling was based on an incorrect application of *Unigard* and *California Shoppers*.

The only reasonable inference to be gleaned from the record is that had FFIC diligently pursued the requisite inquiry on June 3, 1999, FFIC would have discovered within eight weeks the premium payment record on the MLOC Policy, which, according to FFIC, was the key document showing the existence of the MLOC Policy and thus the potential for an equitable contribution claim with respect to defense costs of MLOC, Emma, and Estate in the REV 973 action.

After FFIC received Elster's declaration sent to FFIC on January 16, 2002, it took FFIC less than eight weeks to find a record of a premium payment showing that MLOC was insured under the MLOC Policy from September 1975 to 1978. In a March 11, 2002 letter, FFIC informed MLOC's attorney about the MLOC Policy.

But there is no evidence that the premium payment record located by FFIC in 2002 would not have been discovered within eight weeks upon a diligent inquiry commenced on June 3, 1999. Hayes stated in his 2006 declaration that in 2002 FFIC found the premium payment record on the MLOC Policy by using its updated retrieval system, which permitted a search for lost

policies by the insured's name as well as policy number. Yet Hayes does not establish that the premium payment record of the MLOC Policy would not have been found in 1999 through a diligent search of all sources available to FFIC in June and July 1999 because he failed to explain the information available on the premium payment records, how the premium payment records were arranged, and how difficult it would have been in 1999 to obtain information about an insured's policy from the premium payment records.

In sum, the evidence establishes that, upon a diligent search of FFIC premium payment records pertaining to MLOC, the record of the premium payment on the MLOC Policy could have been found within eight weeks of June 3, 1999. And because the complaint in the REV 973 action alleged that Joseph Sr., Emma, and John were agents or employees of MLOC, FFIC would have been put on notice that the MLOC Policy may potentially cover Emma and Estate.

Accordingly, there is insufficient evidence to support the trial court's finding that had FFIC undertaken a diligent inquiry in 1999, it would have discovered "that only [Joseph Jr.] was seeking a defense." Rather, the only reasonable inference to be drawn from the record is that had FFIC diligently pursued the requisite inquiry on June 3, 1999, it would have discovered, in approximately eight weeks' time, or by July 29, 1999, the existence of the MLOC Policy and the potential claims for equitable contribution for defense costs for the defense of MLOC, Emma, and Estate.

Citing to the notice, cooperation, and voluntary payments provisions of the MLOC Policy, FFIC argues that it would be inequitable to require it to pay defense costs before MLOC, Emma, and Estate made their respective demands on FFIC on dates from January to June 2002. But under *Unigard*, a formal tender by the insured is not required in an action between insurers for equitable contribution; rather, an insurer's obligation of equitable contribution for defense costs arises where, after notice of litigation, a diligent inquiry by the insurer would reveal the potential exposure to a claim for equitable contribution, thus providing the insurer the opportunity for investigation and participation in the defense in the underlying litigation.

Because the undisputed evidence is that had FFIC undertaken a diligent inquiry on June 3, 1999, it would have obtained information affording it notice of the potential equitable contribution claims in approximately eight weeks, or by July 29, 1999, the judgment as to FFIC must be modified to provide that OneBeacon is entitled to equitable contribution from FFIC for the defense costs of MLOC, Emma, and Estate beginning on July 29, 1999.

(7) The parties contest the appropriate standard of review in this case. Whether we apply an abuse of discretion standard of review (*Hartford Casualty Ins. Co. v. Travelers Indemnity Co.* (2003) 110 Cal.App.4th 710, 724 [2 Cal.Rptr.3d 18]), a de novo, or a substantial evidence standard of review (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 347 [86 Cal.Rptr.3d 383] [questions of law submitted on stipulated facts are reviewed de novo, but if stipulated facts leave ultimate fact question open for resolution, the substantial evidence rule applies]), we would reach the same result because substantial evidence does not support the trial court's findings with respect to the dates on which OneBeacon's right to equitable contribution from ICW and FFIC arose. Rather, the record shows that, as a matter of law, OneBeacon's right of equitable contribution from ICW arose on February 26, 1999, and OneBeacon's right of equitable contribution from FFIC arose on July 29, 1999.

## DISPOSITION

The appeal as to National Surety Corporation is dismissed.

That part of the judgment as to Insurance Company of the West setting May 24, 2002, as the starting date on which OneBeacon America Insurance Company is entitled to equitable contribution for defense costs is reversed; the trial court is directed on remand to modify the judgment to provide that OneBeacon America Insurance Company's entitlement to equitable contribution from Insurance Company of the West for the defense costs of Emma Mouren-Laurens and John Mouren-Laurens as administrator of the estate of Joseph Mouren-Laurens, Sr., starts on February 26, 1999.

Those parts of the judgment as to Fireman's Fund Insurance Company setting January 16, 2002, January 31, 2002, and June 21, 2002, as the respective starting dates on which OneBeacon America Insurance Company is entitled to equitable contribution for defense costs of Mouren-Laurens Oil Company, Emma Mouren-Laurens, and John Mouren-Laurens as administrator of the estate of Joseph Mouren-Laurens, Sr., is reversed; the trial court is directed on remand to modify the judgment to provide that OneBeacon America Insurance Company's entitlement to equitable contribution from Fireman's Fund Insurance Company for the defense costs of Mouren-Laurens Oil Company, Emma Mouren-Laurens, and John Mouren-Laurens as administrator of the estate of Joseph Mouren-Laurens, Sr., starts on July 29, 1999.

In all other respects the judgment is affirmed. OneBeacon America Insurance Company is entitled to its costs on appeal from Fireman's Fund Insurance Company and Insurance Company of the West.

Rothschild, J., and Weisberg, J.,[*] concurred.

Petitions for a rehearing were denied July 14, 2009, and the opinion was modified to read as printed above.

---

[*]Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.